## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LANDMARK LEGAL FOUNDATION** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 12-1726 (RCL)** |
| | ) |
| **ENVIRONMENTAL PROTECTION** | ) |
| **AGENCY,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## <u>DEFENDANT'S OPPOSITION TO</u>
## <u>PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS</u>

### INTRODUCTION

This case arises out of a Freedom of Information Act (FOIA) request by Landmark Legal

Foundation (Landmark) that was sent to the Environmental Protection Agency (EPA) on August

17, 2012.  Specifically, Landmark in a letter signed by its president, Mark R. Levin, sent a two-

part FOIA request to EPA, seeking:

> Any and all records identifying the names of individuals, groups and/or organizations
> outside of EPA with which the EPA, EPA employees, EPA contractors and/or
> EPA consultants have had communications of any kind relating to all proposed
> rules or regulations that have not been finalized by the EPA between January 1, 2012
> and August 17, 2012;

and

> Any and all records indicating an order, direction, or suggestion that the issuance of
> regulations, the announcements of regulations and/or public comment of regulations
> should be slowed or delayed until after November 2012 or the presidential election of
> 2012.

Landmark was granted a waiver of all fees associated with this request, but denied expedited

processing.[1]  The EPA assigned this request to the Office of the Administrator for processing, and then engaged in internal discussion about the scope of the request because the document descriptions were so broad that there was no practical way to identify search terms that could better define the records sought.  Also, as written, the request would involve too many people throughout the Agency.  Deposition of Jonathan Newton (Newton Depo.,) at p. 15.  Even though the request was broad and unwieldy, EPA, in good faith, communicated with Landmark to narrow the scope so that a search could begin. Newton Depo., at p. 16 and Plaintiff's Deposition Exh. 19.

        Thereafter, when EPA realized that its search may have been incomplete, not because it had excluded any office or person, but because it appeared that more records should have been located, it continued to search, and ultimately released more information before filing its Motion for Summary Judgment. The fact that EPA's complete response may have been delayed does not mean that the EPA acted in bad faith with regard to Landmark's request. *See Tijerina v. Walters,* 821 F.2d 789, 799 (D.C. Cir. 1987) ("However fitful or delayed the release of information under the FOIA may be . . . if we are convinced [the party has] however belatedly, released all nonexempt material, we have no further judicial function to perform under the FOIA.").

Contrary to Landmark's allegations, continuing to search for and release responsive documents

---

[1]  On December 12, 2012, Landmark filed a Motion for a Preliminary Injunction in this case to compel the EPA to *inter alia* preserve records and to expedite the processing of its request.  *See* ECF # 14 - 19.   That Motion was denied on December 21, 2012.  *See* ECF # 19.  The Court found that there was no indication that the "EPA has or will destroy any records related to this request" and that the 2003 Order, in a previous FOIA case involving Landmark and the EPA, granting Landmark's request for a Preliminary Injunction was distinguishable because of the impending change in Administrations.  In that case, sanctions were levied against the EPA when, electronic records were destroyed in contravention of the court's order.  In the instant case, the Court has issued no such order.  The Court also found *inter alia* that, in this case, the EPA had already indicated that it had begun the process of collecting records and that the mere "potential of destruction" was not sufficient to demonstrate the need for such an order because such a possibility existed with regard to any FOIA request and that the EPA is already barred from destroying many records which would be responsive under the Federal Records Act.  EPA had issued a litigation hold and the individual overseeing the EPA's response to Landmark's request stated that he would "comply to the best of [his] ability" with the EPA's obligation to preserve information relevant to the FOIA litigation and that his staff had been instructed to comply with preservation obligations.  ECF # 16, p. 13.

after a "final" production is complete does not show bad faith but rather shows good faith on the part of the agency. *See Meeropol v. Meese*, 790 F.2d 942, 952-53 (D.C. Cir. 1986). In the end, Landmark received thousands of pages of Agency documents in response to its FOIA request.[2]

On May 15, 2013, EPA filed its Motion for Summary Judgment. ECF # 30. EPA argued that it had conducted an adequate search for the requested records, had provided Plaintiff with a *Vaughn* index that described the withheld information and had properly withheld information from disclosure pursuant to FOIA Exemptions 5 and 6. As a result, EPA requested that the Court enter summary judgment in its favor and dismiss the matter with prejudice. *Id.* at pp. 1-2.

On August 14, 2013, the Court denied EPA's Motion for Summary Judgment, primarily on the basis of unanswered questions regarding the Agency's search, and granted Landmark limited discovery on the following two issues:

1) Whether and to what extent the EPA Administrator, Deputy Administrator, and/or Chief of Staff utilized personal email accounts to conduct official business during the relevant time period; and

2) Whether the EPA initially excluded the Administrator, Deputy Administrator, and/or chief of Staff from Landmark's FOIA request.

*See* ECF # 39 at p. 14.

Thereafter, Landmark submitted two sets of written interrogatories and two requests for the production of documents, which were answered by the EPA. In addition, Landmark deposed five witnesses: Eric Wachter, Director of the Office of the Executive Secretariat (OEX) within the Office of the Administrator of the U.S. Environmental Protection Agency and the declarant

---

[2] EPA initially produced responsive documents to Landmark on February 27, 2013. Between February and April of 2013, in response to communications with Landmark, EPA amended its disclosures to Landmark, culminating in a "final" disclosure of records located in the initial search on April 12, 2013. ECF No. 30, ¶ 15. This disclosure included 1,134 pages in 123 documents released in full, 1,678 pages in 196 documents with redactions, and an index of documents withheld under FOIA exemptions. *Id.,* ¶15. EPA then released the records located in its supplemental search on May 13, 2013.

in the action; Jonathan Newton, FOIA Coordinator in the Office of the Administrator; Aaron

Dickerson, former Special Assistant to former Administrator Lisa Jackson; Robert Perciasepe,

former Deputy Administrator of the EPA; and Lisa Jackson, former Administrator of the EPA.

EPA did not move to block any of these depositions.  These witnesses testified to, among other

things, their record-keeping and record maintenance practices.

   The evidence that Landmark developed during discovery fails to support its claim that

relevant, responsive information was lost, let alone intentionally so.  Ms. Jackson testified that

she generally did not use text messaging for business purposes.  Deposition of Lisa Jackson

(Jackson Depo.) at p. 25.  Mr. Perciasepe testified that with respect to Agency business,

"virtually, [his] only communication using text messages [was] to the [EPA] IT department when

the [Agency's] email is not working." August 7, 2004, Deposition of Robert ("Bob") Perciasepe

(Perciasepe I Depo.) at pp. 45-48.  As to their use of their private email accounts, they testified

that any email thread or document pertaining to EPA business would be transferred to an EPA

electronic recordkeeping system.  Jackson Depo., at p. 42; Perciasepe Depo., at p. 16.  This

testimony serves as additional evidence that EPA's decision to search its Lotus Notes email

holdings demonstrates that the Agency's search was reasonably calculated to uncover the

relevant documents. *See Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).

   In spite of this, on July 24, 2014, Landmark moved for sanctions alleging a "cover up" of

sorts and referring to the EPA's actions in responding to Landmark's FOIA request as not only

subversive, but deceptive and obstructive.  None of this is true and the evidence supports neither

a cover up, subversion, deception or obstructive behavior.

   First, although Landmark raises a host of complaints about EPA, most of these

complaints stem from EPA's first and supplemental search in response to the FOIA request and

are not actually relevant to a spoliation claim.  Indeed, rather than seeking the documents requested, Landmark seeks to drastically expand federal agencies' record-keeping obligations, while also subjecting those obligations to the oversight of private litigants (such as Landmark here).  FOIA neither justifies nor provides for such intrusive relief.

Second, despite Landmark's argument that EPA failed to produce records from personal email accounts and from text messages located on government-issued Blackberry devices, the record shows that despite having taken hours of deposition testimony, Landmark cannot demonstrate that relevant information is likely to have been lost, which is required for spoliation. In other words, Landmark has failed to prove that any material responsive to its FOIA request was destroyed.

Indeed, Landmark's motion entirely fails to discuss whether the purportedly destroyed records were even responsive to Landmark's FOIA request, *i.e.*, relating to the timing of regulations or representing communications with outside parties about proposed regulations. The senior officials who were deposed, including the former Administrator, both stated that they did not use text messaging for substantive business purposes, except for the limited instances Mr. Perciasepe texted Renee Wynn, Assistant Administrator for the Office of Environmental Information (the EPA's Information Technology office) concerning IT problems.  As Ms. Jackson explained, text messages are inherently not well-suited to conducting official EPA business.  Jackson Depo., at p 25:8-10.

Although Landmark makes much of the former Administrator's testimony that numerous outside groups had her phone number—so that, for example, those groups would have a national contact at EPA to assist with the emergency response to the Deepwater Horizon oil spill—that testimony is taken grossly out of context.  As Landmark's counsel clearly acknowledged at the

5

deposition, the former Administrator testified that she was grateful when her *children* sent her text messages; she certainly did not admit to texting with any outside groups. Jackson Depo., pp. 27-28.  This mis-characterization of the former Administrator's testimony exemplifies the thin record on which Landmark now seeks sanctions.  In point of fact, there is only *one* alleged text message that Landmark can point to as having potentially existed—*i.e.*, an alleged text between the former Administrator and the CEO of a cotton oil-absorbent company. But it has not been established that this text message even existed; indeed, Ms. Jackson testified that:

> "I have no way to confirm and I actually doubt that there was a conversation via text
> message. There are lots of folks who reach out, and lots of times I write back and say
> can you send an email or can you in some other way contact me if I believed
> it was more appropriately handled in that context because text messages, little
> short messages are not really appropriate. Jackson Depo. p. 21 ln 16 – p. 22 ln 2."

Moreover, that alleged text message, if it existed, would date from 2010 – well before this FOIA request even was sent to EPA. Finally, this alleged text message is in no way related to rules or rulemaking, the substantive topic of Landmark's request. This single alleged text message—the only one specifically discussed in the record— offers no support whatsoever for Landmark's sanctions motion.

At bottom, Landmark has the burden to establish spoliation of responsive records, but has failed to carry that burden here.  Indeed, Landmark's motion makes no attempt whatsoever to establish that the purportedly destroyed records *were responsive to the underlying FOIA request*. Absent that connection, there can be  no spoliation of relevant information.

Finally, Landmark's motion spends a significant amount of time re-hashing issues related to the past (and ongoing) processing of Landmark's underlying FOIA request.  These issues are wholly irrelevant to the present spoliation motion.  Nonetheless, these issues likewise do not cast any doubt on the EPA's good faith.

In an attempt to finally resolve Landmark's concerns with the Agency's response to its request, as well as to preserve this Court's resources, EPA has voluntarily reached out to Landmark and negotiated the parameters of an entirely new and exhaustive third search.  The attorneys for the parties have met face to face, and exchanged correspondence regarding the multiple search terms that will be used for the new search.  *See* July 31, 2014, Correspondence with Landmark, attached as Defendant (Def.), Exh. 1. The EPA has agreed to the search terms in spite of the fact that these broad terms may produce thousands of pages of unresponsive documents to be manually reviewed.  This review will undeniably take longer than 30 days, but EPA has agreed to provide Landmark with a schedule before September 22, 2014.  The EPA has also, as Landmark requested, begun a manual review of the former Administrator's briefing materials from the account briefing@epa.gov, and on August 29, 2014, sent Landmark its first production from that account.[3]  The EPA will continue to work with Landmark regarding the scope of the agreed upon new search and the documents produced as a result of that search.

## ARGUMENT

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Centrifugal Force, Inc., v. Softnet Comm., Inc.,* 783 F.Supp. 2d 736, 740-741 (S.D. NY 2011).  A party seeking a finding of spoliation has the burden of establishing the elements of a spoliation claim.  These elements are (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the evidence was destroyed with a culpable state of mind and (3) that the destroyed evidence was relevant to the party's claim or defense. *Id.* As Landmark acknowledges, the party seeking spoliation must also establish prejudice as a result

---

[3]  It is anticipated that the parties will confer about the briefing materials that were already produced at a later date; however, that issue is not currently before this Court.

of the spoliation.  Pl. Mot. at 29-30.

Landmark has fundamentally failed to meet these elements.  First, as discussed above, Landmark has not even attempted to establish that any (allegedly) destroyed materials were actually relevant to this litigation—*i.e.*, as responsive to Landmark's underlying FOIA request. Even assuming relevance, moreover, Landmark has also failed to establish prejudice. Landmark's sole argument on this score is a single conclusory sentence:  "Plaintiff cannot contemplate a scenario where it could be more prejudiced."  Pl. Mot. at 34.  Such an assertion is not an argument, much less a basis for concluding that Landmark has adequately carried its burden to demonstrate prejudice.  Finally, even assuming Landmark has sufficiently met the above elements, Landmark has not demonstrated that EPA acted with a culpable state of mind so as to warrant sanctions.  Certainly, Landmark has not justified the imposition of the broad-ranging remedies sought here, many of which find no basis in law or fact.  Thus, Landmark's spoliation motion should be denied, and the EPA should be permitted to continue the ongoing processing and release of documents in response to Landmark's underlying FOIA request.

**I.      LANDMARK IS UNABLE TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT EPA SPOLIATED RECORDS OR ACTED WITH THE REQUISITE CULPABILITY TO WARRANT THE PUNITIVE SANCTIONS REQUESTED.**

Landmark is unable to sustain the heavy burden of persuasion required for this Court to impose sanctions.  A district court's power to impose sanctions flows from two sources: Rule 37(b)(2) of the Federal Rules of Civil Procedure, which authorizes the imposition of sanctions for the violation of a discovery order; and the court's inherent authority to "protect [its] integrity and prevent abuses of the judicial process."  *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (quoting *Shepherd v. American Broad. Cos.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995)).  Rule 37 does not apply here because Landmark has not identified a discovery order that

EPA violated.  The EPA answered Landmark's written discovery requests and acquiesced to its request for depositions.  To the extent that there was a disagreement as to the scope of the deposition questioning, given the limited discovery ordered, that disagreement was promptly resolved by the Court and no issues of that nature remain.  Hence, in the instant case, there is no claimed Fed. R. Civ. P. 37 violation occurring during discovery which could lead to identifiable sanctions.  Nor has there been a violation of a court order, as was the case in *Landmark v. EPA* (Landmark I), 272 F. Supp. 2d 70 (D.D.C. 2003).  *See Mahaffey v. Marriott*, 898 F. Supp. 2d 54, 58 n. 2 (D.D.C. 2012)(A production order is required in order to trigger sanctions pursuant to Rule 37(b)).

The district court's second source of power to impose sanctions is its inherent authority.  "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. American Broadcasting Companies, Inc.,* 62 F.3d 1469, 1474 (D.C. Cir. 1995)(citations omitted).  That inherent power, however, is limited in cases against the United States.  *See Alexander v. F.B.I.*, 541 F. Supp. 2d 274, 301 (D.D.C. 2008) (Lamberth, J.) ("As a general matter, it is unassailable that a court's inherent authority includes the power to assess attorneys' fees or other monetary fines against either parties or their attorneys. Absent a waiver of sovereign immunity, however, that power does not encompass the authority to impose monetary sanctions against the government." (internal citations omitted)).  Thus, it is doubtful that even the most conventional sanction requested by Landmark—attorneys' fees and costs—is available here.

Even assuming that sanction's availability, however, Landmark still has not met the heavy burden of justifying an award here.  Because the Court's inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion "because of

their very potency" *See id;* citing *Chambers v. NASCO, Inc.* 501 U.S. 32, 44 (1991).  The party seeking spoliation sanctions pursuant to a court's inherent powers "bears an evidentiary burden that is calibrated to 'ensure that the gravity of the sanction corresponds to the misconduct.'" *Clark v. Wash. Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 21-22 (D.D.C. 2012) (quoting *Shepherd*, 62 F.3d at 1479); *See Jefferson v. Reno*, 123 F.Supp.2d 1, 4 (D.C. 2000).

A heightened standard of proof is required in cases where the Court asserts its inherent powers because most inherent power sanctions are fundamentally punitive.  *Shepherd*, 62 F.3d at 1476.  The Supreme Court has recognized that awards of attorneys' fees for bad faith conduct serve the same punitive and compensatory purposes as fines imposed for civil contempt.  *Id.*, citing *Chambers*, 501 U.S. at 53-54.  As a result, courts require clear and convincing evidence of misconduct before imposing attorneys' fees and expenses under their inherent power.  *Id.*
 "It is settled that a finding of bad faith is required for sanctions under the court's inherent powers.  Thus, alleged misconduct . . . that does not involve bad faith is . . . beyond the Court's inherent authority to sanction. " *Alexander,* 541 F. Supp. 2d at 304. As stated in *D'Onofrio v. SFX Sports Group, Inc,* 2010 U.S. Dist. LEXIS 86711 * 14 (August 24, 2010), contempt orders, awards of attorneys' fees, and the imposition of fines are all fundamentally punitive in nature and therefore a court must find clear and convincing evidence of the predicate misconduct before imposing them.  Accordingly, there must be clear and convincing evidence that a litigant is substantially motivated by vindictiveness, obduracy, or mala fides for the assessment of attorney's fees and costs.  *Pacificorps v. Northwest Pipeline GP,* 2012 U.S. Dist. LEXIS 174593 * 30-31 (D. Or., Dec. 10, 2012). [4]

---

[4] On the other hand, "issue related sanctions," such as adverse evidentiary determinations and preclusion of evidence are fundamentally remedial rather than punitive and a court may impose such sanctions whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue.  *Id.; see Mahaffey*, 898 F. Supp. 2d 54 a case involving the lower evidentiary burden regarding the "issue related" sanction of

Landmark argues that EPA engaged in intentional spoliation by failing to preserve the senior officials' emails from their personal (non-EPA) account and text messages on their government-issued Blackberry and that it is therefore entitled to, *inter alia*, reasonable attorney's fees and costs incurred in the litigation.  Pl. Mot. at 2, 36.  Because Landmark is unable to satisfy the high evidentiary burden, i.e., clear and convincing evidence of vindictiveness, obduracy or mala fides, required for such an award, an award of attorney's fees and costs in the instant action is not warranted.

A) **Landmark Has Entirely Failed to Establish that Responsive Materials Subject to FOIA Were Destroyed on Personal (Non-EPA) Email Accounts.**

With respect to personal emails, Landmark has failed to establish the destruction of relevant information for three reasons.  First, emails that solely exist in personal email accounts are not "agency records" subject to FOIA because they are not under the custody and control of the Agency.  Second, the record shows that in those limited instances where EPA officials used their personal email accounts, they placed the email into EPA systems for recordkeeping and FOIA purposes.  And third, even assuming that work-related emails existed that were destroyed, Landmark makes absolutely no attempt to establish that those emails were responsive to the underlying FOIA request.

*First*, emails on personal email accounts are not "agency records" subject to FOIA.  For a requester to establish entitlement to a requested record, the requester must establish both that the agency is "withholding" the record and that the requested record is an "agency record."  *See Kissinger v. Reporters Comm. For Freedom of the Press*, 445 U.S. 136, 150 (1980).  To meet

---

an adverse inference; *Ritchie v. United States*, 451 F.3d 1019, 1025 (9th Cir. 2006) (the "burden on the party seeking the adverse inference is lower," and "the trier of fact may draw such an inference based even on a very slight showing that the [destroyed] documents are relevant.")  Because there are no "issue-related" sanctions in this case, there is no basis for the Court to infer agency misconduct.  Rather, there must be clear and convincing evidence of Agency misconduct.

those two requirements, Landmark must show that the requested emails (on the personal email accounts) are in the EPA's possession, custody, and control.  Here, Landmark fails to meet those requirements.  As emails existing solely on personal email accounts, such emails existed outside EPA's possession, so EPA could not have "withheld" those emails.  *Id.* at 150-54.  Moreover, the EPA lacked custody and control over any personal emails.  *See CEI v. NASA*, 989 F. Supp. 2d 74, 86-87 (D.D.C. 2013).  Thus, any emails that resided only in the personal email accounts would not have been subject to FOIA in the first place, so their destruction would not have constituted spoliation or prejudiced Landmark's ability to receive a complete response to its FOIA request. Further, EPA instructed employees to bring such emails onto EPA email systems so that they would be available under FOIA, which the evidence shows was done here.

*Second*, even assuming work-related emails on personal accounts are subject to FOIA, Landmark has not established that any such emails existed that were not properly captured on EPA systems.  The senior officials testified that as to their very limited use of their private email accounts, any email thread or document pertaining to EPA business would be transferred to an EPA system.  Jackson Depo., at p. 42, 44-45; Perciasepe I Depo., at p. 16 – 23, 28-30, 32.  Ms. Jackson testified that it was her responsibility to ensure she did not do anything that would hinder the efforts of the offices to perform their functions under all record-keeping requirements that she had to adhere to.  She also stated that it was her practice to comply with federal laws to ensure that agency records were managed properly.  Jackson Depo., at p. 16-17.  Mr. Perciasepe testified that his responsibility "[wa]s to preserve records so that they are available for the FOIA".  Perciasepe I Depo., at p. 39.

Regarding Ms. Jackson's use of her personal email account, she testified that:

"So what I was instructed to do was to make a practice, which I did, of forwarding *any emails which could be construed as pertaining to government*

12

*business or government records* into the EPA system so that they could be
captured and preserved there[.]"(Emphasis added).

Jackson Depo., at p. 42:10-15

Similarly, regarding Mr. Perciasepe's personal email account, he testified that:

[I]f somebody sent me something to [my personal] email address and it
was related to EPA, I would forward it to be captured in the EPA system . . . If
somebody sends an email to me, which I have to say is extremely rare, in my
personal email that has a question about EPA activities or has comments on
EPA activities or is requesting some action on the part of EPA, I would send it
into the EPA system to be captured in our records management system.

Perciasepe I Depo. at pp. 17, 18.

Eric Wachter, the Director of the Office of the Executive Secretariat (OEX), testified that

with regard to records from personal email accounts, EPA officials were known to forward

emails into the EPA system so that those emails would be captured in the same system as emails

from the work account. Deposition of Eric Wachter (Wachter Depo., at pp. 26 - 28).

This practice is also consistent with EPA's current interim records policy, which states:

Official Agency business should first and foremost be done on
official EPA information systems (i.e., email, instant messaging, (IM),
computer work stations, shared service solutions, etc.).  When due to
extraordinary circumstances, this does not occur, the creator must ensure
that any use of a non-governmental system does not affect the
preservation of Federal records for Federal Records Act purposes, or the
ability to identify and process those records, if requested, under the
Freedom of Information Act (FOIA) or for other official business (e.g.,
litigation, Congressional oversight requests.).  In this very rare occasion,
staff should forward email (or "cc" email) or electronic file(s) to their
EPA email account in order for records to be captured in an approved
EPA records management system.  Once the electronic files have been
captured in an approved EPA records management system, they should
be removed from non-EPA information systems, unless there is a
specific obligation to maintain the files on all systems on which they
appear.  Additionally, emails forwarding a news article or web link from
a personal email account into EPA's system and emails forwarding a
document to a personal email account to enable printing or viewing both
create a copy of the email in EPA's email system.  Users can properly
preserve the copy of the email that is on EPA's system to meet their

preservation requirements.

Exh. 3 to Declaration of Liza Hearns (Hearns Decl.), Interim Records Management Policy CIO 2155.2 at p. 3. Finally, this practice is consistent with the evidence in this case, in which a few documents (such as EPA-32 and EPA-33, representing an unsolicited comment on a rule sent to former Deputy Administrator Bob Perciasepe's personal account) were sent into Agency systems from personal email accounts for records management and FOIA purposes.

Significantly, the EPA's Office of the Inspector General investigated EPA's practice and procedure with regard to the use of personal email accounts and determined that there was no evidence to support the claim that EPA used, promoted, or encouraged the use of private email accounts to circumvent records management responsibilities.  *See* U.S. Envtl. Protect. Agency, Office of Inspector Gen., No. 13-P-0433, *Congressionally Requested Inquiry Into the EPA's Use of Private and Alias Email Accounts* (2013), http://www.epa.gov/oig/reports/2013/20130926-13-P-0433.pdf [5]

Aaron Dickerson, then-Special Assistant to the former Administrator, Lisa Jackson, also directly asked Ms. Jackson whether she could remember any documents that were responsive to Landmark's request.  Deposition of Aaron Dickerson (Dickerson Depo.), at pp. 29-32 and Dickerson Deposition Exhibit 1.  Ms. Jackson told him that she did not.  The fact that Ms. Jackson testified that she deleted many of her personal emails "en masse" without reading them is therefore irrelevant.  Certainly if she did not read them, there was no communication to her and absolutely no proof that they had any relevancy to this request.

Further, Mr. Perciasepe testified that he rarely received official communications via his personal email.  Perciasepe I Depo., at pp. 16, 18.  Landmark presents no evidence, nor does it allege that Mr. Perciasepe deleted any work-related personal emails prior to forwarding them to a

---

[5]   The IG report was produced to Landmark during discovery in this litigation.

government account.  Instead, Landmark merely argues that Mr. Perciasepe's practice of moving
work-related emails from his personal account constitutes spoliation because it is allegedly
inconsistent with EPA's litigation hold.  *See* Pl. Mot. at 26. However, the instruction in the
Agency's litigation hold document to preserve emails in personal accounts has no bearing on
EPA's ability to capture the content of forwarded emails. Moreover, the EPA should not be
punished for issuing a litigation hold that was broader than necessary. The breadth of the
litigation hold does not relieve Landmark of its fundamental obligation to establish the
destruction of relevant materials. Finally, in the exercise of good faith and to address Landmark's
specific concerns, Mr. Perciasepe, with the aid of EPA's Office of General Counsel, searched his
personal [non-EPA] accounts for relevant documents and found nothing.  Perciasepe I Depo., at
p. 28.

   *Third*, even if there had been some evidence of lost official emails on personal email
accounts (which there is not), Landmark makes no attempt whatsoever to establish that any such
emails were actually responsive to the FOIA request.  To be sure, Landmark is not required to
prove the exact contents of the destroyed documents.  But Landmark, in order to show culpable,
bad faith conduct, is required at least to give *some* basis for assuming the destroyed evidence was
relevant to the litigation.  Here, Landmark had numerous opportunities to make that showing
throughout the discovery process, but did not even *ask* the EPA officials about the content of any
destroyed documents.  This defect is fatal, highlighting how Landmark has failed to carry its
burden of establishing that responsive records were destroyed.

   Similarly, even assuming destruction of relevant personal emails, Landmark makes no
attempt to establish that the emails were destroyed at a time when EPA had a duty to preserve
them.  Landmark cannot establish spoliation, for example, if personal emails were deleted before

EPA even received Landmark's FOIA request.  This complete absence of evidence regarding the *timing* of any alleged destruction is yet another fatal defect to Landmark's attempt to establish spoliation.

With respect to personal emails there is no evidence, much less clear and convincing evidence, that EPA destroyed responsive material, or that EPA did so with the culpable mindset of bad faith necessary for the imposition of sanctions.  Speculative allegations are insufficient as the court must make an explicit finding that the target of the sanctions acted in bad faith if the court is to exercise its inherent power.  *Alexander*, 541 F. Supp. 2d 274 at 304.

### B) Landmark Has Not Established That Responsive Text Messages Were Destroyed.

Similarly, with respect to text messages, Landmark has once again entirely failed to carry its burden of establishing the destruction of relevant information.  First, EPA officials again testified that they had no recollection of using text messages for conducting official EPA business.  Both former Administrator Jackson and former Deputy Administrator Perciasepe testified that they had government-owned Blackberries but did not use text messaging for substantive official business.  The Deputy Administrator, Mr. Perciasepe testified that "virtually, [his] only communication using text messages [was] to the [EPA] IT department when the email is not working."  Perciasepe I Depo., at p. 45-48.  He also stated that his family would text him but that he did not use his Blackberry to access personal or family email accounts.  *Id.,* at p. 47.  The former Administrator testified that the "Blackberry was an insufficient tool" and that "text messages, little short messages are not really appropriate."  Jackson Depo., at p. 49, 22.  When asked what modes of communication Ms. Jackson used with people when she was the EPA Administrator, she said that "[t]he practice that [she] employed was to have daily meetings, briefings, briefing book[s], letters, correspondence, telephone calls, emails were certainly a tool.

In general [she] considered text messaging to ... not [be] a good method for use". *Id.*, at p. 86;

*see also id.* at 25 ("I didn't use text messages to do government business in general.").

Landmark accuses former Administrator Jackson of testifying that she communicated

with "people in corporations, people in the environmental movement, people in government,

people in nonprofits, people in academia, my family," and that '[s]he would be grateful' when

those individuals would text her." Pl. Mot. at 23 (quoting Jackson Depo. at p. 26).  But this last

statement—implying that Administrator Jackson received text messages from all such outside

groups and individuals—is a gross mischaracterization of her deposition testimony.  That

testimony was clearly about former Administrator Jackson being grateful *when her kids* would

text her on her government number, as Landmark's counsel clearly acknowledged at the

deposition itself:

> Q. How many people had your government cell number, your 203 -- was it 203, 202?
> A. 202.
> Q. We'll call it 202.
> A. Oodles, highly scientific.
> Q. People in the environmental movement?
> A. People in corporations, people in the environmental movement, people in government, people in nonprofits, people in academia, my family. I had one phone number, so if my kids wanted to call me, that's the number they would use.
> Q. And if they wanted to text you, that was the number?
> A. Absolutely, and I would be grateful when they did.
> Q. As we all would.

Jackson Depo. at p. 26-27.  Landmark's attempt to mis-characterize this testimony as former

Administrator Jackson admitting that she was grateful when *any* person texted her is

disingenuous at best.  Landmark had the opportunity to clarify this issue and make clear that

former Administrator Jackson texted with other individuals.  But instead Landmark chose to rest

on (and mis-construe) this single passage of testimony.  This single passage is plainly

insufficient to carry Landmark's burden of proof, particularly given the ample amount of

17

testimony from former Administrator Jackson confirming that her practice was *not* to use text messages for official business.

When the former Administrator resigned her position at the EPA and left her office in February 2013, she surrendered her government-issued Blackberry to her Administrative Assistant, Mr. Aaron Dickerson. As Mr. Dickerson, testified, he released the former Administrator's Blackberry to an individual in the Property Section.  But Mr. Dickerson had no reason to believe that the Blackberry was a repository likely to contain federal records or information responsive to Landmark's request, particularly given that he had asked Ms. Jackson if she had any records responsive to Landmark's FOIA request.  Additionally, Ms. Jackson testified that she did not use text messages for substantive business purposes and EPA Political appointees were instructed upon arrival since at least 2009, "not to use any outside email account to conduct official Agency business."  *See* Plaintiff's Deposition Exhibit 55, entitled "Records and ECMS Briefing" at p. 10.

To prepare the Blackberry to be surplused, EPA's Property Section sanitized the Blackberry.  See Exhibit 2 (documenting action taken by Property Section to allow for surplusing). The EPA has attempted to reconstruct what was on the former Administrator's Blackberry but has been unsuccessful. Hearns Decl., at ¶ 7.  Thus, if former Administrator Jackson had text messages on her Blackberry that were not otherwise preserved at the time she left EPA when she surrendered her Blackberry, those text messages would now be lost.  But again, Landmark offers absolutely no evidence that any text messages existed, much less evidence that such text messages were responsive to the underlying FOIA request.  Further, Landmark cannot show a culpable state of mind on the part of EPA.  Mr. Dickerson thought that his responsibilities ended with the EPA repository of the former Administrator's secondary EPA

account (the "Richard Windsor" account), and he had no reason to believe that the Blackberry was a repository likely to contain responsive materials, particularly since he had asked Ms. Jackson if she had any records responsive to Landmark's request. Dickerson Depo., at pp. 17, 29-32. [6]

Finally, once again, even assuming that Landmark established the destruction of work-related text messages generally (which it has not), Landmark certainly has not established the destruction of text messages *pertaining to proposed regulations*. Landmark had the opportunity to inquire about this point during discovery but chose not to. Furthermore, Landmark has not established the necessary *timing* of any purported destruction—*i.e.*, that the destruction occurred after EPA had a duty to preserve the messages. Thus, Landmark has failed to carry its burden of demonstrating the destruction of responsive records.

C) **Landmark's Failure to Prove that Any Relevant Materials were Destroyed is Further Confirmed by the Discovery Testimony**

Despite hours of deposition testimony, Landmark failed to demonstrate that relevant information is likely to have been lost, which is what is required for spoliation. "[Parties] engage in spoliation of documents as a matter of law only if they had 'some notice that the documents were potentially **relevant**' to the litigation before they were destroyed." *United States v. Kitsap Physicians Service*, 314 F.3d 995, 1001 (9th Cir. 2002) (emphasis added). Landmark is unable to demonstrate that EPA knew of the use of personal emails on a non-EPA account or of text

---

[6] Landmark makes reference in its motion to the fact that the EPA had not, before this briefing, responded to it regarding the former Administrator's Blackberry or other actions with regard to preservation of text messages and personal email accounts. Pl. Mot, 26-29. However, the EPA was primarily focused on defining the scope of the new search in those communications. EPA stated in its letter to Landmark dated May 23, 2014, that "EPA hopes that this communication provides Landmark with the context for [the] search, and with various amenable options to move forward, and we hope to meet with you again, this time in-person, to come to an agreement on the additional search, *and to continue our discussions on the other issues you raise in your letter*. The EPA is willing and thinks it would be helpful to engage a magistrate judge to aid the parties in coming to an agreement and resolution on the search." *See Exhibit 1A,* May 23, 2014 Letter to Landmark at p. 6-7(emphasis added). The EPA has always been willing to continue to engage Landmark in discussion about all of the issues pertaining to this case. Landmark, rather than continuing that dialogue, chose to file the instant motion.

messages on a government-issued Blackberry that were relevant to the litigation and then
allowed them to be destroyed.

In spite of months of discovery and rigorous cross-examination of EPA officials,
Landmark never asked any of the witnesses whether they were ever in possession of any
documents, emails or text messages that were in any way relevant to Landmark's FOIA request.
This is despite Landmark's incessant criticism of EPA's initial and supplemental search, which
EPA has already agreed to remedy by doing a third and altogether new search.  However, when
asked whether she had any knowledge of political consequences being a factor in the
classification standards of the Office of Information and Regulatory Affairs ("OIRA"), [7]  Ms
Jackson stated:

> I don't have that knowledge.  The interactions with OIRA would be about
> the rule, and timing would be subject to trying to work through with OIRA
> a long list of concerns they might have on any rule, and they could be
> small things, but they could often be very large ones, and the way that
> manifested to me was if they didn't approve it, it wouldn't go out, and
> why was never apparent to us.  We were never told that it was for political
> reasons, so you would assume that it would be for substantive reasons.
> **There was never a memo or anything that said for these reasons we
> are not going to approve this rule, for political reasons.**
> (Emphasis added)

Jackson Depo., at pp. 100-101.

Furthermore, Mr. Perciasepe testified that:

> You know, I can only go on my own personal experience here.  My couple
> of times a month, not weekly, conversations with Cass Sunstein [of OIRA]
> about technical issues that needed to get resolved, that's what I did.  **He
> never said to me in my calls or my meetings with him, Bob, please
> don't do this rule because somebody in the White House told me to do
> it, [or] not to do it.  That never happened.** (Emphasis added)

---

[7]   The Office of Information and Regulatory Affairs (OIRA) is one of several statutory offices within the Office of
Management and Budget (OMB), which is located within the executive Office of the President (EOP).  OIRA
reviews the substance of hundreds of proposed and final rules each year on behalf of the President before they are
published in the *Federal Register*. These reviews are authorized by Executive Order 12866, which was issued by
President Clinton on September 30, 1993.

Perciasepe Deposition dated February 21, 2014 Perciasepe II Depo., at p. 47 ECF, No. 46-22 (emphasis added).

In short, there is no basis in fact to presume that the documents that Landmark theorizes were spoliated ever existed; to the contrary, the available evidence indicates that they did not, and Landmark has failed to meet its burden to demonstrate otherwise.

### D)  Landmark Has Not Established Prejudice.

As Landmark acknowledges, a party seeking spoliation sanctions must establish prejudice as a result of the destruction.  *See* Pl. Mot. at 30.  Here, Landmark does not even attempt to make such a showing.  And even assuming the destruction of documents, such prejudice here is highly doubtful.  Given the inherent nature of text messages—short, limited communications sent on devices without access to full keyboards —it is highly doubtful that substantive work was conducted through such a medium.  Even if it were, moreover, the substance of such work could easily be captured in other places or media that *were* preserved and searched pursuant to FOIA.  For example, the only specific alleged text message relied upon by Landmark—a purported text between former Administrator Jackson and the CEO of a cotton oil-absorbent company—is memorialized in an email that was later produced pursuant to FOIA.  *See* Dickerson Depo. Exh. 5. This email and this alleged text, produced in response to a different request, have nothing to do with rules or rulemaking and would not be relevant or responsive to Landmark's request. Landmark has made no serious attempt to establish prejudice, and all record evidence indicates that there is no such prejudice.  *See* Jackson Depo. at 21-22 ("I actually doubt that there was a conversation via text message. There are lots of folks who reach out, and lots of times I write back and say can you send an email or can you in some other way contact me if I believed that it was more appropriately handled in that context because text messages, little short

messages are not really appropriate.").  Given Landmark's complete failure to even discuss the prejudice inquiry, Landmark's motion should be denied.

### E)   Landmark Has No Evidence that Unnamed "Other Senior Officials" Had Responsive Documents That Were Destroyed

Landmark also argues that Defendant committed spoliation by failing to produce text messages and personal emails of other senior officials assigned to Defendant's headquarters.  Pl. Mot. at 2, 33.  However, speculative allegations that spoliation occurred are insufficient to justify sanctions.  *See Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 171 (D.C. Cir. 2013) ("The movant must make some showing that the destroyed evidence would have been relevant to the contested issue.") (quoting *Kronisch*, 150 F.3d at 127) (internal quotation marks omitted).

Here, Landmark asks the Court to infer that *all* senior officials used text messages and personal email for official purposes, and therefore that Defendant's failure to produce responsive records constitutes spoliation.  Not only is this purely speculative, but such a broad assumption does not make the requisite showing of actual bad faith for a spoliation claim such as this.  For those inherent power sanctions that are fundamentally penal – dismissals and default judgments, as well as contempt orders, awards of attorney's fees, and the imposition of fines – a district court must find clear and convincing evidence of the predicate misconduct.  Heightened certainty is called for both to guard against the misguided imposition of sanctions that are fundamentally punitive and to reduce the risk of erroneously tarnishing a party's reputation with findings of bad faith or some other quasi-criminal wrongdoing.  *See Alexander, supra.,* quoting *Shepherd.*

Landmark asks the Court to infer both the existence and the relevance of evidence that may or may not have been created by other officials, apparently based on the testimony of the former Administrator that various individuals had her government cell-phone number. Jackson Depo., at pp. 27-28.  As explained above, Landmark's assertion that the former Administrator

22

communicated by text for government purposes is not borne out by the record.  The former

Administrator confirmed that her practice was *not* to use text messages for substantive official

business.  Landmark cannot speculate that because outside groups had the government cell phone

number of the former Administrator, which, as explained above, was entirely reasonably given

the need for such groups to communicate in the event of emergencies such as the Deepwater

Horizon spill, that meant that other senior officials were texting on their government cell phones

regarding Agency business relevant to Landmark's FOIA request.  These allegations are far too

speculative and unsupported by the facts to justify a finding of spoliation.  Furthermore, the

Court may not infer bad faith by the supposed existence of evidence that may or may not have

been created by EPA senior officials, based on the testimony of the former Administrator that

various individuals had her government cell phone number. Jackson Depo., at pp. 27-28.  This is

not the kind of conduct that comports with a finding of bad faith, *i.e.*, action that is substantially

motivated by an improper purpose, vindictiveness, obduracy, or mala fides.  *See Pacificorp,*

2012 U.S. Dist. LEXIS 174593 *30 – 31 (D. Or., Dec. 10, 2012).

Further, contrary to Landmark's assertion that EPA has done nothing to respond to its

concerns regarding "other senior officials," EPA has, in fact, taken action to address Landmark's

concerns and to determine whether any information responsive to the FOIA request at issue was

contained on government-issued blackberries as text messages or on personal email accounts.

Specifically, 17 senior EPA officials were contacted, who were identified as having information

related to Landmark's 2012 FOIA request and who were employed by the EPA as of September

2014.  Declaration of Larry Gottesman, (Gottesman Decl.) ¶4.  As explained in Mr. Gottesman's

declaration, these 17 individuals were asked to state whether, to the best of their recollection,

they used text messaging or personal (non-Agency) email accounts to send or receive

information regarding rules or rulemakings in the January to August 2012 time-frame.  None of these individuals recalled using text messaging to discuss proposed rules or rulemaking in the time period of January – August 2012.  *Id.*, at ¶ 6-7.  Based on his communications with these senior officials, Mr. Gottesman found no indication that any text messages responsive to the request from Landmark Legal Foundation existed.  *Id.*, at ¶ 6-8.

As to personal (non-Agency) email, Mr. Gottesman found no indication that there may be additional information on personal email accounts responsive to the request from Landmark Legal Foundation that is not already available on an Agency system.  *Id.*, at ¶ 6-8.  A few officials indicated that they would use their personal email if remote access to the Agency's server was not operating, or to facilitate printing information at home.  *Id.*, at ¶ 7.  These actions are in accordance with the EPA's Interim Records Policy, which provides that when a non-governmental system is used, the user is to forward any federal records into the EPA email system so they can be captured for records management purposes, and for FOIA compliance.  *See* Exh. 3 to Hearns Decl.  Mr. Gottesman's declaration demonstrates that there is no indication that there may be additional information on personal email accounts responsive to the request from Landmark Legal Foundation that was not made available and preserved on an Agency system.  Again, EPA's own Inspector General, at the request of Congress, specifically investigated the use of personal email to determine if, as Landmark claims, personal email accounts were used to evade FOIA and found that they were not.  *See* U.S. Envtl. Protect. Agency, Office of Inspector Gen., No. 13-P-0433, *Congressionally Requested Inquiry Into the EPA's Use of Private and Alias Email Accounts* (2013), http://www.epa.gov/oig/reports/2013/20130926-13-P-0433.pdf . Landmark's allegations are baseless.

Moreover, as to mobile devices, the Agency has had public guidance since 2005, entitled "*Frequent Questions about Mobile and Portable Devices, and Records*," which expressly provides that "[r]ecords created on your Mobile Device should be transferred to your office's recordkeeping system on a regular basis." Exh. 1 to Hearns Decl.  In February 2013, EPA transitioned from its Lotus Notes email system to Microsoft Outlook365.  Hearns Decl., ¶ 4.  In advance of that transition, all users who were issued Agency Blackberries, including the senior officials subject to Landmark's FOIA request, were informed of the transition and the need to preserve information not stored on EPA servers in advance of the transition. Hearns Decl., at ¶¶ 4-6.  EPA explained to Blackberry users that all EPA email, calendar, contacts and "to do" data are stored on EPA servers and would not be affected by the transition. *Id., at ¶ 5.*  EPA's guidance instructed users to manually store on their computers material on their devices that was not stored on EPA servers, such as pictures and applications.  *Id.*  Thus, prior to this transition, the Agency instructed Blackberry users to store material that was located only on their Blackberry (and not an EPA server) on their agency computer.  EPA took these actions to ensure that individuals were aware that their Blackberries would be reset to factory settings as part of the transition to Outlook 365 and that information stored locally to the device should be saved.

Although there is no evidence that senior officials used text messages to discuss rulemaking, which is the subject of Landmark's FOIA request, in an effort to be proactive and responsive to Landmark's inquiries, the EPA nevertheless contacted Verizon, which was the Agency's primary Blackberry provider in 2012, to ascertain its record retention policies. According to Ms. Hearns, whose staff contacted Verizon, the content of a text message is only available for up to 10 days.  Further, Verizon retains non-content information related to the text messages, like the number from which a text was sent, for only one year from the date of the

text.  *See* Hearns Decl., at ¶ 7.

Nonetheless, there is still *no evidence* that there may have been text messages responsive to the request from Landmark, and substantial evidence that there were no such text messages. Nor is there any evidence that there were responsive emails on personal accounts that have not been placed into EPA systems.  Thus, Landmark has failed to carry its burden to establish the destruction of relevant information at a time when EPA was under a duty to preserve that information.

## II.   THE ARGUMENTS REGARDING THE PROCESSING OF THE FOIA REQUEST ARE IRRELEVANT, BUT IN ANY EVENT CONFIRM THE EPA'S GOOD FAITH ACTIONS.

The arguments regarding the EPA's past actions processing the FOIA request are irrelevant to the present issue—whether EPA destroyed relevant evidence, and had a culpable state of mind when doing so.  Nonetheless, even were the Court to consider the arguments related to the underlying FOIA request, the EPA's actions only confirm the EPA's good faith.

### A.   EPA's Initial Search for Responsive Records (October 2012 – January 2013)

The EPA received Landmark's FOIA request on August 21, 2012, in the National FOIA Office in the Office of Environmental Information. The processing of Landmark's FOIA request was then assigned to the Office of the Executive Secretariat in the Office of the Administrator as the lead office. As Mr. Wachter testified, the Office of the Executive Secretariat in the Office of the Administrator is responsible for managing the correspondence and records of the Agency Administrator.  Newton Depo., at p. 80; Wachter Depo at pp. 10-15; 47-50; Wachter Sup. Decl. dated July 21, 2013 ¶ 25a – f.  Jonathan Newton, the FOIA Coordinator for the Office of the Administrator, spearheaded EPA's efforts to respond to Landmark's request.  While Landmark seeks to establish an atmosphere of stalling and bad faith on the part of EPA by alleging that the

Office of the Administrator was excluded from the initial search, the FOIA request was actually assigned to the Office of the Administrator and it was the lead office responsible for processing this request. The testimony also reveals that from the very beginning of the process, both Mr. Newton and Mr. Wachter interpreted Landmark's FOIA request *to include* the Administrator, Deputy Administrator, and Chief of Staff for EPA. Wachter Depo, at p 10, 83-85; 97, 99-101, Newton Dep., at p. 9-10.

Plaintiff has, throughout this litigation, pointed to the internal instructions sent from the FOIA Coordinator for the Office of the Administrator to the FOIA Coordinators for the other EPA Program Offices[8] as the primary evidence that EPA purposefully excluded the Administrator and Deputy Administrator.  This argument is misleading and shortsighted.  The instruction sent from Mr. Newton to the FOIA Coordinators for the other EPA offices stated: "**Note: this request has been modified.**  The search only applies to Assistant Administrators, Deputy Assistant Administrators, and Chiefs of Staff in EPA Headquarters." Thus, the request was limited to only the senior officials. Plaintiff makes much of this internal description of the narrowed scope of their request but ignores the fact that no one at the EPA interpreted the request as excluding the Office of the Administrator.   *See* Shaw Decl., Exh. 1; Wachter Depo., at pp 83-84.  As both Mr. Newton and Mr. Wachter have testified, there was no reason to add the Administrator's office, which included the Administrator, Deputy Administrator, and Chief of Staff to this internal communication because Mr. Newton was the FOIA Coordinator for the Administrator's Office and it was the Administrator's Office that *was the lead office* sending the instructions on processing this FOIA request to the Program Offices. Newton Depo., at pp. 5, 9-11, 17-22; May 15, 2013 Declaration of Eric Wachter at ¶ 5; July 24, 2013 Supp. Decl. of Eric

---

[8] "Program Office" is internal EPA shorthand for the various offices in EPA headquarters, each of which is headed by an Assistant Administrator. (Wachter Suppl. Decl. ¶ 11).

Wachter at ¶ 8-14. The instructions were designed to provide guidance to the *other* offices that also needed to search. There is no convincing evidence that this internal instruction, sent from the Office of the Administrator to the EPA Program Offices, reflects bad faith or a decision to intentionally exclude the Administrator or the Administrator's Office, particularly in light of multiple instances of sworn testimony to the contrary. Wachter Depo., at pp. 83-84 Newton Depo., at pp. 9-11; 17-24.

Mr. Newton sent these instructions to his counterparts, the FOIA coordinators of the Program Offices, to initiate the search for records from the Assistant Administrators, Deputy Assistant Administrators, and Chiefs of Staff in the other Program Offices. While it is not known exactly when each of the FOIA Coordinators for the various Program Offices communicated with the assigned administrative assistants to begin the search in each of their respective offices, it is clear that on November 14, 2012, Mr. Newton sent an email to Aaron Dickerson, Special Assistant to then-Administrator Lisa Jackson, and Nena Shaw, Special Assistant to then-Deputy Administrator Robert ("Bob") Perciasepe, informing them that the request "requires a search of the Administrator's and the Deputy's email accounts." At the same time, Mr. Newton also forwarded to these Special Assistants Landmark's FOIA request and the search instructions he had drafted and provided to the other FOIA coordinators.  Newton Depo., at pp. 17-22; Declaration of Nina Shaw Exh. 1 at p. EPA PROD1_0459.

Mr. Dickerson's testimony demonstrates both the difficulties presented by Plaintiff's FOIA request and his good faith efforts to surmount those difficulties. Mr. Dickerson describes in detail how he received and read the FOIA request and Mr. Newton's instructions, and that he could not determine how to search for responsive records. Dickerson Depo., at pp. 25, 19-25. So he called Mr. Newton and asked him how to search for the responsive records.  Mr. Newton

provided guidance to Mr. Dickerson and suggested that he ask the Administrator if she remembered having any responsive records. As a result, Mr. Dickerson asked Ms. Jackson personally if she had records, and, as the record shows, Ms. Jackson stated that she had no responsive records that she could recall. But Mr. Dickerson also, to the best of his ability, independently read the FOIA request and attempted to search for responsive records. Dickerson Depo., at p. 25-28.

Mr. Dickerson testified that he conducted a search of Ms. Jackson's secondary email account (a non-public EPA account used for her official business) using the search terms draft rule, draft regulation, draft policy, and proposed rule, proposed regulation, and proposed policy. Dickerson Dep., at p. 27-28. He further testified that he reviewed approximately 200 potentially responsive emails located using key words for substantive responsiveness to Plaintiff's request. He also testified that based on his understanding that Plaintiff was looking for communications "with an outside organization," he did not find records responsive to the first part of Plaintiff's request. Finally, Mr. Dickerson testified that he personally reviewed these emails to see if the Administrator had received or given any direction to delay any type of rule or regulation until after the election, and from what he saw, did not find any documents responsive to the second part of Plaintiff's request. Dickerson Depo., at pp. 28-29.  On November 16, 2012, Mr. Dickerson responded to Mr. Newton stating that he had found no documents responsive to the request. Dickerson Depo., at pp 29-32; Dickerson Depo, Exh. 1.  At most, this testimony demonstrates only that Mr. Dickerson had attempted to respond to Plaintiff's vague request to the best of his ability.  He may have been mistaken in his assessment, but there is no evidence of any subversive instruction or plan on the part of anyone to delay the search for the Administrator's records.

In addition, contrary to Landmark's assertion that no search of the Deputy Administrator's records had ever been performed before April 2013, Nena Shaw, his Special Assistant, performed a search for responsive records as part of the initial search. [9]  *See* Declaration of Nena Shaw (Shaw Decl.), ¶¶ 9-12. She, like Mr. Dickerson, was confused and unclear about how to go about conducting a search for the information responsive to Plaintiff's broad and vague request. Shaw Decl., ¶ 7. Her confusion, in addition to her multiple responsibilities, resulted in a delay in processing the Landmark FOIA request.  However, she was never instructed not to search for responsive records or to otherwise delay the search. *Id., at* ¶ 6.

Because of her confusion, Ms. Shaw relied upon the search performed by Robin Kime in the Office of Policy for guidance on how to conduct a search for records responsive to Plaintiff's request, which included search terms such as "hold," "delay," "election," and "November" in addition to Mr. Newton's suggested terms of "draft," "proposed," "rule," "regulation" or "policy". *Id., at* ¶¶9-10; and Exh 2 to Shaw Declaration.  Ms. Shaw searched all locations which, in her view, were likely to have responsive records, which were the Deputy Administrator's EPA email account and his computer.  *Id., at* ¶9  She did not search for paper files, as the paper files in the Deputy Administrator's office were from 2010 or earlier, and there were no newer paper files. She did not specifically search or request to search text messages, or personal email accounts, as it was her understanding that any relevant material in those locations was to be forwarded and maintained in EPA's email system for search and production in response to

---

[9] Plaintiff refers to the testimony of Mr. Newton, as well as the email records, to assert that Ms. Shaw never performed this search. But Ms. Shaw was never deposed.  Although Mr. Newton was apparently unaware of Ms. Shaw's efforts, she has provided a declaration, explaining both how she attempted to conduct this search and her difficulties with using the collection database to upload responsive records.  *See* Shaw Declaration, attached hereto. Plaintiff did not ask to depose Ms. Shaw personally as to her conduct regarding the search for records from the Deputy Administrator, relying instead on the testimony of Mr. Newton.

information requests and for records purposes.[10] *Id.*  Ms. Shaw found few records that she

deemed potentially responsive to Landmark's request based on the criteria provided by Ms.

Kime and by her personal reading of the request.  *Id., at ¶10.* Nonetheless, she attempted to

upload these records into the collection database, and when unable to do so from her own

computer, forwarded Mr. Newton's instruction email containing the link to the Deputy

Administrator's email account in another attempt to upload the records. *Id.*, at ¶11-12.  But when

Ms. Shaw was unable to use the link to upload the records into the database, she printed out the

potentially responsive records. Unfortunately, this technical difficulty meant that the records

were not in the collection database for the February production.  *Id.*

Nevertheless, at the end of its initial search, EPA produced records that included 1,134

pages in 123 documents released in full (including many records of communications with third

parties), 1,678 pages in 196 documents with redactions, and an index of documents withheld

under FOIA exemptions. ECF No. 30 at p. 6, ¶ 17.  This release represented a good faith effort to

process Plaintiff's FOIA request and provide responsive records based on the information that

EPA had at the time. EPA does not deny that due to a variety of issues, including a broadly

worded, vague and confusing FOIA request and technical difficulties in processing the request,

the very first search resulted in a lack of responsive documents in the collection database from

the Administrator and Deputy Administrator.  EPA's voluntary and good faith attempts to correct

this inconsistency led to the supplemental search for responsive records beginning in April 2013.

As a result, additional documents were produced.  But as the evidence demonstrates, at no time

was the Administrator or Deputy Administrator *excluded* from the initial search.

---

[10] The testimony of Mr. Perciasepe bears this out -- he forwarded information from his personal email account into
EPA systems for records and FOIA purposes. (Perciasepe I Depo., at p.16.)

**B. *EPA's Supplemental Search for Additional Responsive Records and Final Production (April – May 2013).***

Landmark mischaracterizes EPA's supplemental search for responsive records from the Administrator and Deputy Administrator as an exercise in deception. This could not be further from the truth. As described above, EPA made a good-faith initial effort to respond to Plaintiff's vague, broad, confusing request, and then, when EPA determined that the initial effort resulted in a potentially insufficient search, EPA immediately notified Plaintiff and the Court of the issue and without delay worked to rectify the search and produce any additional records to Plaintiff as quickly as possible. As Landmark itself notes in its Motion, EPA contacted Landmark within a day of its realization that there may have been additional responsive records to inform Landmark that there may be more responsive records. (Pl. Mot. at 20).

EPA's response to Plaintiff's first interrogatory and the accompanying records produced in response to Plaintiff's document requests demonstrate in further detail what occurred. (Pl. Ex. at 6, Resp. to Interrog 4; Pl. Ex. At 3, Resp. to Interrog 1).  When the search for records was carefully reviewed as part of finalizing the pleadings for the April 30, 2013 filing deadline in this case, EPA (including EPA lawyers) noticed that the documents previously collected, reviewed, and produced from EPA program offices were inconsistent with the "no records" response that EPA had received from Aaron Dickerson of the Office of the Administrator on November 16, 2012. (Pl. Ex. at 3, Resp. to Interrog 1). The documents were inconsistent with a no records response because EPA had produced records from its program offices in the February 27, 2013 response that contained the secondary email address of the former Administrator[11] Therefore,

---

[11] Indeed, a significant portion of the discussion and conference with Landmark on March 21, 2013 was regarding whether to unredact the secondary account of the former Administrator (the

EPA conducted an additional search of the records of the Administrator, Deputy Administrator, and Chief of Staff in a good faith effort to ensure a complete and adequate production to Plaintiff. This additional search, using very broad key words, identified more than 4500 potentially responsive records, which, after review, yielded approximately 365 additional documents responsive to Landmark's request.

Landmark's additional allegations and insinuations regarding the supplemental search are unreasonable, inconsistent with the facts and do not illustrate bad faith.  For example, Landmark characterizes the instruction from Mr. Newton that "universal search terms may be difficult to establish" as incorrect, or indicative of bad faith, because the Office of General Counsel provided a search string to use for the supplemental search. (Pl. Mot. at 20). But the search string developed by the Office of General Counsel to be used on the Administrator's, Deputy Administrator's, and Chief of Staff's accounts in the supplemental search was simply: (draft OR proposed) SENTENCE (rule OR regulation OR policy). This string was not created anew for the supplemental search; rather, it is simply Jonathan Newton's original suggestion that potential key words could include "draft or proposed" within the same sentence as "rule, regulation, or policy," written in Lotus Notes syntax. This search string was known to be overbroad, and returned many thousands of non-responsive records. EPA, in an effort to demonstrate good faith, manually reviewed these many thousands of records from the Administrator, Deputy Administrator, and Chief of Staff.  However, as EPA has informed Landmark, running this overbroad and overinclusive search string on the accounts of every senior official was not and is not necessary, because EPA's program offices uploaded their responsive records into the

---

Windsor.Richard@epa.gov email account), which EPA unredacted after former Administrator Jackson departed the Agency as there was no longer a privacy interest in this address upon her departure.

database, as described in Mr. Wachter's Declarations regarding the initial search.  Going forward, EPA has already committed to undertake yet a third search for responsive records, this time with search terms agreed upon by the parties. Exh. 1.

Similarly, Landmark's assertion that Mr. Newton's instruction to ask about these records as "it is the type of memo/policy that someone should remember" is somehow in bad faith, "ad hoc" or improper. Pl. Mot. at 17, 20. But Landmark's own testimony before this Court demonstrates that, in fact, asking individuals what they remember, in addition to suggested terms, is how Landmark envisioned EPA processing its vague request. (April 9 Status Conf. Trans. at 9-10; Landmark Email to EPA).  Asking the Administrator if she had any recollection of any documents that would satisfy Landmark's FOIA request, and then following-up with an electronic search, is hardly demonstrative of bad faith.[12]

EPA released the additional records it had discovered in its supplemental search less than two weeks later, on May 13, 2013, and filed its Motion for Summary Judgment on May 15, 2013, with an explanation of the need for an additional search for records and with a full accounting of the additional records discovered, including a complete *Vaughn* index of all 465 records withheld in full or in part. A perusal of the *Vaughn* index demonstrates that many of the responsive records produced as a result of the supplemental search in April 2013 were also produced as part of the original search and production.[13]

Furthermore, despite Plaintiff's claim that EPA purposefully excluded relevant conversations with the Office of Management and Budget (OMB) or with the Office of

---

[12]   In addition, Landmark has requested EPA to go to Senior Officials personally in the third search and ask them how different environmental groups are referred to within the EPA, amongst other things.

[13] For example, EPA-17, produced on February 27, 2013, contained the same information as EPA-286, produced on May 13. Similar examples include EPA-4, produced on February 27 (containing the same information as the later-produced EPA-282), EPA-74 and EPA-75 (which contain the same information as the later-produced EPA-268), EPA-198 (containing the same information as the later-produced EPA-347), and EPA-185 (containing the same information as the later-produced EPA-288).

Regulatory Affairs (OIRA) in the White House, or that EPA has purposefully failed to produce relevant briefing material, it is a fact that EPA located responsive information that included records of conversations with OMB,[14] located records of conversations with White House officials,[15] and located records of briefing materials that were prepared for meetings.[16] Nevertheless, going forward, EPA has agreed to manually review each and every record from the briefings@epa.gov account (the so-called "briefing books") for material responsive to Plaintiff's request as part of the negotiated third search for responsive records. (Exh. 1; *see also* April 9 Transcript, page 12, 8-11).

Landmark claims that Mr. Wachter's testimony in his May 15, 2013 Supplemental Declaration about the search being potentially insufficient was false.  (Pl. Mot. at 21). But the testimony and documents in this matter *support* Mr. Wachter's statement in his Declaration that, as part of finalizing the documents for the Court's April 30, 2013 filing deadline, EPA determined that the search for documents from the former Administrator, Deputy Administrator, and Chief of Staff may have been insufficient and that another search may be required.  EPA informed Landmark of precisely what it knew on April 30, which was that the search for records from the Administrator and Deputy Administrator may have been insufficient, and that additional time would be necessary.  Landmark accuses EPA of lying by omission, but has failed to establish that Mr. Wachter knew of any details about the search of the Deputy Administrator's records.  What he did know was that the former Administrator's records may have to be searched

---

[14] See, for example, EPA-245 and EPA-246.

[15] See, for example, EPA-21, EPA-393 through EPA-397, and EPA-294.

[16] See, for example, EPA-302 through EPA-305, described as an email chain pertaining to an upcoming meeting and briefing for former EPA Administrator Lisa Jackson in regard to proposed rulemakings and corresponding interaction with the Office of Management and Budget; or EPA-328, which is one of many examples of briefing material prepared for Bob Perciasepe to prepare for a meeting with the Environmental Council of the States. Material from the Administrator's "Daily Reading File" was also provided to briefings@epa.gov as "briefing book" material, and was produced to Plaintiff. See, e.g. EPA-432, EPA-435, and EPA-448, among others.

again and therefore the previous search was potentially inadequate.  Wachter Depo., at pp. 57-60; 69-72.

Despite Landmark's self-serving characterization of events, EPA's attempts to, as quickly as possible, supplement the initial search is indicative that the agency was operating in good faith.  The bottom line was that the first search was found to be insufficient and a second search was done to correct that potential insufficiency.

### C.   EPA has committed to a third search for responsive records, which goes well beyond the basic requirements of FOIA, in an effort to demonstrate good faith.

Currently, EPA has agreed to a new and exhaustive third search.  The attorneys for the parties have met face to face, and exchanged email correspondence regarding the multiple search terms that will be used for the new search.  *See* Exh.1. These search terms identify 24 specific rules that were of interest to Plaintiff, 25 specific "outside parties" that Plaintiff identified as of interest, and 8 additional specific terms related to offices or individuals within the White House that are of apparent particular interest. In order to develop this search, because Landmark was unable to provide search terms for its request, EPA undertook a wide-ranging research project interviewing multiple EPA staff members in the Office of General Counsel and the Office of Policy. Exh. 1.  EPA has agreed to perform this search, requiring no less than 72 independent search strings, and to report back to Plaintiff on September 22, 2014 with its findings. *See Id.* This search is currently underway.

The EPA has agreed to the search terms in spite of the fact that these terms are overly broad and will undoubtedly produce thousands of pages of unresponsive documents to be manually reviewed.  This review will undeniably take longer than 30 days.  The EPA estimates that it will take at least 180 days to review all of the documents for responsiveness and

application of exemptions, although a more precise time frame cannot be provided at this time. The EPA has begun its search regarding Lisa Jackson, the former Administrator's briefing materials from the account briefing@epa.gov and on August 29, 2014, sent Landmark its first production from that account.[17]  The EPA will continue to work with Landmark regarding the scope of the agreed upon new search and the documents produced as a result of that search. Also, as stated previously, EPA would not object to the assignment of a magistrate to assist in the resolution of any additional issues regarding the search for responsive documents to Landmark's FOIA request.

### III.     LANDMARK IS NOT ENTITLED TO THE REMEDIES SOUGHT.

Landmark asks this Court to order a litany of sanctions in addition to its demand for attorney's fees and costs.  *See* Pl.'s Mot. Sanctions 36-37.  Landmark also asks the Court to appoint an independent monitor, provide notice to any litigant across the country since 2009 of potential spoliation of records in unrelated FOIA requests, produce all responsive records from EPA's renewed and negotiated search within 30 days, and direct the EPA's independent Inspector General to conduct an investigation of EPA's response to this request.

A district court does have "a great deal of discretion in exercising its inherent powers to fashion an appropriate sanction, but because of their potency, such powers must be exercised with restraint."  *D'Onofrio*, 2010 WL 3324964, at *5 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991)).  A court's inherent power encompasses the authority to impose sanctions including fines, awards of attorney's fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence.  *See Shepherd*, 62 F.3d at 1475.  As discussed above, however, the Court's exercise

---

[17]   It is anticipated that the parties will confer about the briefing materials that were already produced at a later date; however, that issue is not currently before this Court.

of these punitive measures is also limited by sovereign immunity.  *See Alexander*, 541 F. Supp.

2d at 301.  Landmark provides no authority that would support its requested sanctions in the

event the Court made a spoliation finding.  The role of the independent monitor sought by

Landmark exceeds the authority permitted under the Federal Rules of Civil Procedure.

### To the Extent that Landmark Seeks a Special Counsel Investigation, Such an Order Would be Premature Even if the Court Determined that Spoliation Had Occurred.

To the extent that Landmark seeks a Special Counsel investigation under 5 U.S.C. §

552(a)(4)(F), such an order is unwarranted, particularly at this time.  This Court made clear that

the "written findings" required to initiate such an investigation may only be issued after the court

has (1) ordered the production of improperly withheld records, and (2) imposed attorney's fees

against the United States.  Aug. 18, 2014 Mem. Op. 14 n.8, ECF No. 39; *accord Perry v. Block*,

684 F.2d 121, 125 n.19 (D.C. Cir. 1982).  This Court has taken neither of these actions, and

should not at this time.  In *Jefferson v. Reno*, 123 F. Supp. 2d 1, 3 (D.D.C. 2000), the court noted

that sanctions under Subsection (a)(4)(F) are only proper after written findings have been issued

*and* the agency has *failed to produce records in violation of a court order*.  The court went on to

note that "[s]anctions under section 552(a)(4)(F) and (G) are premature because the Court's

findings necessary to impose such sanctions must await the production of improperly withheld

records."  *Id.* (citing *Perry*, 684 F.2d at 125 n.19).  These decisions suggest that the sanction of

referral to the office of Special Counsel is reserved for instances in which a plaintiff in a FOIA

action substantially prevails, the court orders the production of improperly withheld documents,

and the defendant then fails to produce those documents.  This is not the case here.

Landmark's attempts to obtain private oversight over EPA's record-keeping practices are

precluded.  That does not mean that federal employees may evade their record-keeping (and

disclosure) obligations simply by conducting work on private equipment or accounts.  In such

situations, both the Agency and NARA have enforcement duties to recover records, *see* 44 U.S.C. § 2905, 3106, and agencies may also undertake internal corrective measures against employees who violate record policies.  *See Crew v. SEC & Exch. Comm'n,* 916 F. Supp. 2d 141, 149 (D.D.C. 2013) (noting that agencies may take "internal remedial steps" and "intra-agency corrective actions" in response to records violations (citing *Armstrong v. Bush,* 924 F.2d 282, 296 (D.C. Cir. 1991)(*Armstrong I*)).  In *Kissinger v. Reporters Committee for Freedom of the Press*, the Supreme Court explained that the Federal Records Act establishes only one remedy for the improper removal of a "record" from the agency: "The head of the agency is required. . . .to notify the Attorney General if [she] determines or 'has reason to believe' that records have been improperly removed from the agency."  445 U.S. 136, 148 (1980) (quoting 44 U.S.C. § 3106).  Here Landmark seeks to inject itself into this administrative process, which is not only precluded but also unwarranted.  Indeed, EPA officials have acted in good faith with regard to Landmark's FOIA request.

Additionally, Landmark provides no relevant authority in support of its request that the Court order Defendant to provide notice to all adverse litigants since 2009 of a finding that potential spoliation occurred.  Such relief far exceeds any remotely appropriate sanction.  Lastly, because the parties have agreed to a schedule for the future production of records, the requested order compelling production within thirty days is not necessary to ensure the collection and production of documents in response to the agreed-upon new search.

## CONCLUSION

Despite extensive discovery, Landmark fails to meet its evidentiary burden to demonstrate that responsive, relevant information was likely spoliated in this case. The facts on the record demonstrate EPA's good faith efforts to meet its disclosure obligations, and do not

warrant the intrusive relief that Landmark requests. For the foregoing reasons, the Defendant requests that Landmark's spoliation motion be denied.

Respectfully submitted,

RONALD C. MACHEN JR. D.C. BAR # 447889
United States Attorney
For the District of Columbia

DANIEL F. VAN HORN, D.C. BAR # 924092
Chief, Civil Division

By:     /s/
    _____
    HEATHER D. GRAHAM-OLIVER
    Assistant United States Attorney
    Judiciary Center Building
    555 4th St., N.W.
    Washington, D.C.  20530
    (202) 252-2520
    heather.graham-oliver@usdoj.gov

Of Counsel:

Jennifer Hammitt
U.S. Environmental Protection Agency
Office of General Counsel, General Law Office