UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LANDMARK LEGAL FOUNDATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 12-1726 (RCL) |
| | ) |
| ENVIRONMENTAL PROTECTION AGENCY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the Court is the plaintiff's motion [46] for spoliation sanctions against the defendant Environmental Protection Agency ("EPA"). Upon consideration of the plaintiff's motion [46], the defendant's opposition [55], the plaintiff's reply [59], the defendant's surreply [62], the arguments presented by both parties at the motion hearing held on January 28, 2015, the applicable law, and the entire record herein, the Court will DENY the plaintiff's motion for spoliation sanctions.

Two possible explanations exist for EPA's conduct following Landmark Legal Foundation's filing of a Freedom of Information Act ("FOIA") request in August 2012. Either EPA intentionally sought to evade Landmark's lawful FOIA request so the agency could destroy responsive documents, or EPA demonstrated apathy and carelessness toward Landmark's request. Either scenario reflects poorly upon EPA and surely serves to diminish the public's trust in the agency. While the government is correct that the record does not support a finding of punitive spoliation sanctions, the Court shall take this opportunity to express its discontent with EPA's continued disregard for its FOIA obligations.

## I. BACKGROUND

Landmark is a public interest law firm focused on politically conservative causes. "Among Landmark's primary activities is the dissemination of information to the public about the conduct of governmental agencies and public officials . . . ." Compl. ¶ 4. On August 17, 2012, Landmark filed a two-part FOIA request, pursuant to 5 U.S.C. § 552, seeking:

> 1. Any and all records identifying the names of individuals, groups and/or organizations outside the EPA with which the EPA, EPA employees, EPA contractors and/or EPA consultants have had communications of any kind relating to all proposed rules or regulations that have not been finalized by the EPA between January 1, 2012 and August 17, 2012. For the purposes of this request, "communications of any kind" does not include public comments or other records available on the rulemaking docket.

> 2. Any and all records indicating an order, direction or suggestion that the issuance of regulations, the announcements of regulations and/or public comment of regulations should be slowed or delayed until after November 2012 or the presidential elections of 2012.

Compl. Ex. 1 at 2. On October 5, 2012, Jonathan Newton, a FOIA coordinator for EPA's Office of the Administrator, inquired whether Landmark would "consider narrowing the search to senior officials in EPA [headquarters] (i[.]e., Program Administrators, Deputy Administrators and Chiefs of Staff)." Def.'s Mot. Summ. J., Wachter Decl. Ex. C at 1-2, ECF No. 30-4. Landmark, through its counsel Matthew Forys, agreed to limit the scope of its original request to "senior officials in EPA [headquarters]." *Id.* at 1. Unlike Newton, Forys conspicuously chose not to include any qualification for "senior officials in EPA [headquarters]."[1]

---

[1] While Landmark could have provided greater clarity by specifying that it intended to include EPA's Administrator, Deputy Administrator, and Chief of Staff in the narrowed search, the Court will presume that Landmark did not agree to exclude those officials. The fact that this agreement was struck between Landmark and a FOIA coordinator for EPA's Office of the Administrator further leads the Court to believe that EPA understood this more limited search to *include* the most senior members of the agency. *See also Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 178 (D.D.C. 2013) (noting EPA's eventual concession that it understood the term "senior officials" to include the Administrator, Deputy Administrator, and Chief of Staff in the Office of the Administrator).

After denying Landmark's initial request for expedited processing on August 29, 2012, Compl. Ex. 2 at 1, EPA subsequently denied Landmark's appeal on October 18, 2012, Compl. Ex. 4 at 3.   In response to EPA's rejection of its appeal, Landmark filed the instant suit on October 22, 2012.

On October 23, 2012, EPA's Office of the General Counsel issued a litigation hold notice[2] instructing employees to preserve "potentially relevant information." Mot. Ex. 2 at 2-7, ECF No. 46-3.   The litigation hold notice explained that electronically stored information ("ESI") must be preserved regardless of whether it is "stored on optical disks (e.g., DVDs and COs), flash memory (e.g., 'thumb,' 'flash,' or other USB drives), PDAs or mobile/smart phones (e.g., BlackBerry), network drives (e.g., F, G, H, J, Rand Z drives), your EPA-issued desktop and/or laptop computer, privately owned computers or other devices, or in personal email accounts." *Id.* at 4.   In other words, the litigation hold obligations applied to both official and personal devices.

EPA's Office of General Counsel forwarded the hold to forty-five agency employees understood to be potential custodians of responsive documents. *See id.* at 11-12.   Among the recipients were Eric Wachter, who oversaw the processing of FOIA requests for the Office of the Administrator, Jonathan Newton, a FOIA coordinator under Wachter's supervision, Aaron Dickerson, the Special Assistant to EPA's then-Administrator Lisa Jackson, and Nena Shaw, the Special Assistant to EPA's then-Deputy Administrator Robert Perciasepe. *Id.*   The hold was not sent directly to former Administrator Jackson[3] or Deputy Administrator Perciasepe.   And unlike

---

[2] EPA would issue a reminder regarding the Landmark litigation hold on August 20, 2013, but this time to a more expansive distribution list across the agency. *See* Pl.'s Mot. Ex. 3, ECF No. 46-4.

[3] Jackson stated that she did not learn of the existence of the litigation hold until "August or July 2013," after she had left the EPA. Mot. Ex. 1 at 55:18-56:6 (Jackson Dep., Mar. 27, 2014).

Wachter and Newton, neither Dickerson nor Shaw acknowledged receipt of the litigation hold notice. *Id.*; *see also* Mot. 7-8.

Also on October 23, 2012, Newton emailed Landmark's agreed-upon request to other EPA FOIA coordinators, setting an October 30 "due date." Mot. Ex. 16, ECF No. 46-17. Yet for reasons still unexplained, Newton did not include Dickerson or Shaw—and, consequently, the offices of the Administrator or Deputy Administrator—among the recipients of this email. It was not until three weeks later, on November 14, that Newton forwarded his October 23 email, along with a follow-up email dated October 31 responding to questions from other coordinators, to Dickerson and Shaw. Mot. Ex. 17, ECF No. 46-18.[4]   The 2012 presidential and congressional elections occurred on November 6.

Two days after receiving Newton's November 14 email, Dickerson responded that he "searched the Richard Windsor account as well as verbally spoke with the Administrator and did not find any responsive documents." Mot. Ex. 17; Mot. Ex. 18 at 29:20-24, ECF No. 46-19 (Dickerson Dep., Feb. 11, 2014). Former Administrator Jackson maintained a "secondary" EPA email account under the alias "Richard Windsor,"[5] given the massive inflow of emails to her publicly available "primary" account.[6]   According to Newton, "[a]ny responsive records would

---

[4] In the October 23 email that was eventually forwarded to Dickerson and Shaw, Newton incorrectly noted that the search "only applies to Assistant Administrators, Deputy Assistant Administrators and Chiefs of Staff in EPA Headquarters." Mot. Ex. 16. The Court recognizes that Newton must have known such a limitation on Landmark's request was erroneous given his statement in the November 14 email that the October 23 email "should have gone to [Dickerson and Shaw] since the request requires a search of both the Administrator's and the Deputy's email accounts." Mot. Ex. 17.

[5] The full email address was Windsor.Richard@epa.gov. *See* Opp'n 32-33 n.11.

[6] In its summary judgment briefing, the EPA explained the need for the former Administrator's primary and secondary internal email accounts:

> Because the widespread use of email has become commonplace, EPA Administrators have been assigned two email accounts: a primary account and a secondary account. The email address for former Administrator Jackson's primary account was posted on the EPA's website and was used by hundreds of thousands of Americans to send messages to the Administrator. This account was maintained and monitored by staff, and the emails were processed as official correspondence as appropriate. The secondary account was an everyday, working email account of the Administrator

have been in the Richard Windsor account" because "[w]hatever the Administrator needed to see was placed in that account." Mot. Ex. 4 at 26:2-11, ECF No. 46-5 (Newton Dep., Feb. 25, 2014). Dickerson never searched Jackson's personal, non-EPA email account, Mot. Ex. 18 at 38:14-16, ECF No. 46-19, or Jackson's BlackBerry for email or text messages, *see* Opp'n 18-19 (implying that there was no need for Dickerson to search Jackson's BlackBerry because "he had no reason to believe that the BlackBerry was a repository likely to contain responsive materials"). Yet Landmark presented evidence that Jackson did, in fact, use her personal email account and her BlackBerry to conduct government business. *See* Mot. Ex. 24, ECF No. 46-27 (email from Jackson's personal account sent to other EPA employees while using her BlackBerry). EPA erased Jackson's BlackBerry subsequent to the former Administrator's resignation in February 2013. Opp'n 18.

Former Administrator Jackson explained that it was not the Administrator, but rather the former Deputy Administrator Perciasepe who maintained "regular interactions" with Cass Sunstein, the Administrator of the White House's Office of Information and Regulatory Affairs ("OIRA"), and with OIRA generally. Mot. Ex. 1 at 67:5-11. Given OIRA's direct role in EPA's policymaking process, one could assume that if anyone at EPA produced records responsive to Landmark's request, it would be the Deputy Administrator. Shaw, however, apparently chose to ignore Newton's November 14 email. There is no evidence in the record that Shaw—or anyone else, for that matter—conducted a search of the Deputy Administrator's records prior to December 20, 2014. *See* Opp'n, Shaw Decl. ¶¶ 7-9, ECF No. 55-9. The only purported

---

to communicate with staff and other government officials. This secondary email account was used for practical purposes. Given the large volume of emails sent to the primary account—more than 1.5 million in fiscal year 2012, for instance—the secondary email account was necessary for effective management and communication between the Administrator and colleagues.

Def.'s Reply 9-10, ECF No. 35 (quoting *id.* Ex. G at 13 (Wachter Supp. Decl., July 24, 2013)).

evidence that Shaw conducted a search of the Deputy Administrator's files at all is Shaw's exceedingly vague declaration to that effect. *Id.* ¶¶ 9-12.[7]  Newton never received any documents from Shaw, Mot. Ex. 4 at 39:9-11, despite Shaw's assertion that she had come across responsive records, *id.* ¶¶ 10-12.  Shaw left her position as Special Assistant to the Deputy Administrator in April 2013. *Id.* ¶ 13.

Following this Court's denial of Landmark's motion for a preliminary injunction compelling EPA to expedite processing of the request and preserve certain records, *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270 (D.D.C. 2012) (denied in part because "there [was] no indication that the EPA ha[d] or w[ould] destroy any records related to [Landmark's] request"), it appeared as though EPA was properly executing a search. *See also* Def.'s Opp'n to Pl.'s Mot. Prelim. Inj., Wachter Decl. ¶ 15, Dec. 19, 2012, ECF No. 16-1 ("I certified that I read and understood the meaning and scope of the litigation hold notice, and that I will comply to the best of my ability with the EPA's obligation to preserve information relevant to this FOIA litigation. My staff has been instructed to comply with all preservation obligations for relevant information concerning this FOIA request and FOIA litigation.").  Between February 7 and April 12, 2013, EPA produced three sets of responsive documents to Landmark.  Def.'s Mot. Summ. J., Statement of Material Facts ¶¶ 9, 11, 15.

On April 30—the day EPA was due to file its motion for summary judgment, *see* ECF No. 26—EPA informed the Court that it would require an extension of time to file its motion because it discovered "a number of additional documents that may potentially be responsive to [Landmark's FOIA] request, which have not yet been reviewed by the agency."  Def.'s Mot. Extension of Time 2, ECF No. 27.  In his declaration accompanying EPA's eventual motion for

---

[7] Newton, in his deposition, contradicts Shaw's declaration about having searched the former Deputy Administrator's records. Mot. Ex. 4 at 36:24-39:3. Shaw also never notified Newton of her alleged search efforts. *See id.*

summary judgment, Wachter merely stated that his office "determined that the search for documents from the former Administrator, the Deputy Administrator, and the Chief of Staff in the Office of the Administrator may have been insufficient." Def.'s Mot. Summ. J., Wachter Decl. ¶ 19, ECF No. 30-1.[8] Wachter would later testify that he made this determination based on information relayed to him by Newton and EPA's Office of General Counsel ("OGC"), rather than through any personal observations. Mot. Ex. 20 at 58:19-23, ECF No. 21 (Wachter Dep., Feb. 12, 2014). In a deposition taken the following year, Newton explained *how* EPA became aware of its deficient search: "In this instance the records that were being produced showed that there may have been records from the [A]dministrator or [D]eputy [A]dministrator that had not been produced or were not among the records that [EPA was] turning over." Mot. Ex. 4 at 47:12-17. EPA had noticed that records involving the Administrator or Deputy Administrator were produced by *other* EPA employees, yet were not produced by the Administrator or Deputy Administrator. Opp'n 32-33. At the time of the summary judgment motion, neither EPA nor Wachter raised any issues related to the delay in searching—or possible failure to search—the Administrator's and Deputy Administrator's records from October 2012 to April 2013. EPA's second, "supplemental" search for records between April 30 and May 15, 2013, uncovered "365 additional documents responsive to [Landmark]'s request"—a figure nearly equal to the number

---

[8] On February 27, 2015, EPA submitted a notice of withdrawal regarding the Wachter declarations dated May 15, 2013, ECF No. 30-1, and July 24, 2013, ECF No. 35-7. Def.'s Notice of Withdrawal, ECF No. 66. EPA states that, because portions of the declarations "can be read to imply—incorrectly—that Defendant's initial search included the Chief of Staff," the EPA withdraws the two declarations in their entirety and "will not subsequently rely on those declarations." *Id.* at 2. In other words, twenty-one months after filing Wachter's affidavit to support EPA's motion for summary judgment, the agency asks this Court to ignore it. The absurdity of this request cannot be understated. During the motion hearing just one month ago, the Court asked EPA why it has not moved to withdraw from the docket previously filed affidavits and declarations that contained statements now confirmed to be erroneous. EPA argued vehemently that withdrawal was unnecessary since such statements were made, allegedly, to the best of the respective declarant's knowledge and, therefore, were not technically untrue. The EPA's notice of withdrawal comes far too late, and is insulting to Landmark and to this Court. EPA will not receive any benefit of the doubt regarding either the veracity—or lack thereof—of Wachter's previously filed statements or EPA's heavy reliance thereon throughout the agency's brief in opposition to Landmark's motion for spoliation sanctions.

of records produced prior to May 15. Mot. Summ. J., Statement of Material Facts ¶¶ 16-17. On February 27, 2015—nearly two years after its initial search—EPA conceded, for the first time, that its initial search *did not* include the Chief of Staff. *See* Notice of Withdrawal 2 ("[The agency] has found no evidence that the EPA's Chief of Staff . . . was included in the initial search."). *See also infra* n.15.

Upon review of the summary judgment briefings and the existing record in this case through mid-2013, the Court denied EPA's motion and ordered limited discovery on August 14, 2013. *Landmark*, 959 F. Supp. 2d at 184-85. Troubled by possible "indicat[ions] of bad faith on the part of the agency," this Court permitted Landmark to investigate (1) whether the Administrator, Deputy Administrator, and Chief of Staff used unsearched *personal* email accounts to conduct agency business, and (2) whether the agency "purposefully excluded the top leaders of the EPA" from its initial search. *Id.* at 184.

Landmark engaged in discovery from September 2013 through February 2014. The plaintiff deposed former Administrator Jackson, former Deputy Administrator Perciasepe, Wachter, Newton, and Dickerson, and received a series of documents from EPA related to the agency's purported initial FOIA search. Mot. 14. The Court has already summarized the relevant information revealed during the discovery process throughout this background section, and will examine the key findings further below.

Given the unsatisfactory processing of EPA's initial and supplemental searches, the parties agreed to a third search of EPA's records, and EPA subsequently produced additional documents during the second half of 2014. Opp'n 7. At the motion hearing held before this Court on January 28, 2015, Landmark stated that it has no reason to believe EPA's third search was noncompliant with the agreed-upon search protocol.

Nevertheless, thirty months after Landmark's initial FOIA request, it remains unclear to this Court whether EPA undertook a comprehensive search of either official or personal email accounts belonging to the agency's senior leadership. While the existing record in this case does not support a holding that EPA acted in bad faith, it is obvious to this Court that EPA has, once again, fumbled its way through its legally unambiguous FOIA obligations.

## II.  LEGAL STANDARD

### A.  Sanctions

Landmark asks that this Court levy sanctions against EPA for alleged spoliation of records responsive to Landmark's FOIA request. The sanctions Landmark seeks are largely punitive, including attorney fees and costs as well as money damages "in the form of a fine sufficient to deter EPA from committing misconduct in the future." Mot. 36-37.[9]

Federal courts maintain inherent powers "to protect their integrity and prevent abuses of the judicial process . . . ." *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995). "The [Court's] inherent power encompasses the power to sanction attorney or party misconduct." *Id.* (collecting cases). Punitive sanctions, such as "fines, awards of attorneys' fees and expenses, [and] contempt citations," require a district court to find *clear and convincing* evidence of misconduct.[10] *Id.* at 1478; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991).

"Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764

---

[9] Landmark also requests a number of other discovery-related orders from the Court that are less obviously punitive, such as an independent monitor. *Id.* However, the Court finds it either unnecessary or unwarranted to grant any of the other relief that Landmark requests. *See infra* Section III.A.4 (Other Forms of Relief).

[10] As opposed to issue-related sanctions, such as "drawing adverse evidentiary inferences or precluding the admission of evidence," which may be imposed "whenever a *preponderance of the evidence* establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Id.* at 1475, 1478 (emphasis added).

(1980). This Court has previously held that two principal restraints encapsulate the framework for determining the propriety of sanctions in a given case. First, "the [C]ourt must find some connection between the sanctioned conduct and a process of the [C]ourt in the litigation before it." *Alexander v. FBI*, 541 F. Supp. 2d 274, 303 (D.D.C. 2008). In other words, the misconduct in question must affect the Court's ability "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 59 (internal quotation marks and citation omitted). Here, there can be no doubt that any spoliation of responsive records by EPA would have negatively affected the Court's ability to both decide EPA's summary judgment motion and manage the discovery phase of this case. Second, as Landmark effectively concedes, Mot. 33, "before exercising its inherent power to award sanctions, the [C]ourt must make an explicit finding that the target of the sanctions acted in bad faith." *Alexander*, 541 F. Supp. 2d at 304 (internal quotation marks and original alteration omitted); *see also Roadway Express*, 447 U.S. at 767. This second restraint embodies the central question at issue in Landmark's motion.

### B. Spoliation

A party has "an obligation to preserve and also not alter documents it kn[ows] or reasonably should have known were relevant to the [present] litigation if it kn[ows] the destruction or alteration of those documents would prejudice the [opposing party]." *Shepherd*, 62 F.3d at 1481 (internal quotation marks and citation omitted). "A party that fails to preserve evidence runs the risk of being justly accused of spoliation—defined as the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation—and find itself the subject of sanctions." *Clarke v.*

*Washington Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 20 (D.D.C. 2012) *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013) (internal quotation marks and citations omitted).

In its opposition, EPA cites the following three elements as required for a court to find sanctionable spoliation:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the evidence was destroyed with a culpable state of mind[;] and (3) that the destroyed evidence was relevant to the party's claim or defense.

Opp'n 7 (citing *Centrifugal Force, Inc., v. Softnet Comm., Inc.*, 783 F.Supp. 2d 736, 740-741 (S.D.N.Y. 2011)).[11] Yet this is the test used by other members of this Court to determine if an *adverse inference instruction*—an issue-related, rather than punitive, sanction, *Shepherd*, 62 F.3d at 1478— is justified as a result of spoliation. *See, e.g., Clarke*, 904 F. Supp. 2d at 21; *Chen v. D.C.*, 839 F. Supp. 2d 7, 12-13 (D.D.C. 2011); *Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (citing *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 101 (D. Md. 2003)); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Therefore, it is largely inapplicable to the present case, since Landmark does not seek an adverse inference instruction. *See* Mot. 32-33, 36-37.

Case law in this Circuit is sparse regarding *punitive* sanctions for spoliation. In *Chen*, Judge Friedman noted that if the moving party "demonstrates [by clear and convincing evidence] that the opposing party destroyed discoverable material it knew or should have known was relevant to pending, imminent, or reasonably foreseeable litigation, courts [generally] award the [moving party] its attorney's fees and costs" as a punitive sanction. 839 F. Supp. 2d at 16 (quoting Jamie S. Gorelick et al., Destruction of Evidence § 3.16, at 118 (1989 & 2010 Supp.)).

---

[11] EPA also correctly notes that "the party seeking spoliation must also establish prejudice as a result of the spoliation." *Id.* at 7-8. Of course, any spoliation of responsive documents would result in prejudice to Landmark.

In *Clarke*, Judge Contreras described the three-step analysis governing a *default judgment* punitive sanction, which is warranted when:

> (1) the other party has been so prejudiced by the misconduct that it would be unfair to require [the party] to proceed further in the case; (2) the party's misconduct has put an intolerable burden on the court by requiring the court to modify its own docket and operations in order to accommodate the delay; or (3) the court finds it necessary to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.

*Clarke*, 904 F. Supp. at 21 (citing Webb v. District of Columbia, 146 F.3d 964, 971 (D.C. Cir. 1998). However, neither case proscribed a standard by which to specifically evaluate the merits of a motion for monetary punitive sanctions—i.e., Landmark's motion before this Court.

Nonetheless, the instant suit does not require the Court to fashion a new standard for punitive spoliation sanctions. Circuit law establishes that the Court may only grant a motion for punitive spoliation sanctions if the moving party demonstrates by *clear and convincing evidence* that the opposing party destroyed relevant evidence in *bad faith*. *See Shepherd*, 62 F.3d at 1477; *United States ex rel Miller v. Holzmann*, No. 95 Civ. 1231, 2007 WL 781941, at *2 (D.D.C. Mar. 12, 2007) (In a prior FOIA case concerning the government's alleged destruction of evidence, this Court noted that even if it "was inclined to consider dismissal as a [punitive] sanction . . . , it must be satisfied by clear and convincing evidence that the accused party acted in bad faith."); *cf. Chambers* 501 U.S. at 45-46 ("[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." (internal quotation marks and citation omitted)). The present facts permit the Court to sufficiently assess Landmark's sanctions request under such generalized principles.

## III.   ANALYSIS

Here, Landmark cannot show by clear and convincing evidence that EPA engaged in bad faith conduct. There is no doubt that EPA's behavior following Landmark's August 2012 FOIA

request raised a reasonable *suspicion* of wrongdoing.  This Court held as much when it denied

EPA's motion for summary judgment and ordered limited discovery to investigate the possibility

that "EPA may have purposefully attempted to skirt disclosure under [] FOIA."  *Landmark*, 959

F. Supp. 2d at 184.  Yet after months of discovery pertaining to EPA's search process, Landmark

has uncovered insufficient evidence that EPA actually failed to preserve responsive documents in

bad faith.[12]  And without demonstrating that EPA spoliated documents with the culpable state of

mind necessary for punitive sanctions, Landmark cannot ask the Court to *infer* the relevance of

any potentially missing documents.  *See Chen*, 839 F. Supp. 2d at 15 ("Relevance . . . may be

inferred if the spoliator is shown to have a sufficiently culpable state of mind, on the theory that

a culpable spoliator may have something to hide."  (internal quotation marks and citations

omitted)).  Devoid of at least a favorable inference of relevance, Landmark has no claim for

punitive spoliation sanctions.

### A.    Landmark Lacks Sufficient Proof of Spoliation

#### 1.    *EPA's Delay in Searching the Records of the Administrator and Deputy Administrator*

Even if unintentional, Jonathan Newton's delay in forwarding Landmark's agreed-upon

request to Aaron Dickerson or Nena Shaw engendered a cloud of suspicion over EPA's search

process from the very start.  The three weeks between Newton's first email to other EPA FOIA

coordinators and his email to Dickerson and Shaw happened to straddle the very event at the

heart of Landmark's FOIA request—the November 2012 federal elections.  EPA offers no

cognizable explanation for the delay, presenting contradictions rather than answers.  In its

opposition brief, EPA simply ignores the three-week delay in forwarding Landmark's request to

---

[12] At the motion hearing, Landmark further conceded that, to date, it has discovered no documents supporting a factual finding that EPA made decisions with the 2012 federal elections in mind.

the assistants for the Administrator and Deputy Administrator. Def.'s Opp'n 27-28, ECF No. 55. Newton, in his deposition, merely states that he "apologized . . . for the delay," and that "it was [his] fault[] that [he] didn't get [the request] to [Dickerson and Shaw] right away." He provides no reason for *why* he excluded the assistants to the two senior-most members of the agency in his original email to EPA FOIA coordinators. Mot. Ex. 4 at 25:5-12.[13]  Wachter, on the other hand, denies that there was any meaningful delay, stating that a "three-week delay is not at all surprising" and "not at all a concern" given "other FOIA requests that probably came in that required [Newton's] attention."   During what should be a concerted effort to reaffirm the public's trust in the EPA, the agency's general refusal to accept responsibility for its mistakes throughout this case is baffling.

Moreover, when Dickerson and Shaw allegedly searched their superiors' records—Dickerson in mid-November 2012, Mot. Ex. 17, and Shaw purportedly at some unspecified time no earlier than late December 2012, Opp'n, Shaw Decl. ¶¶ 7-9— they could only have done so with abject carelessness. Dickerson stated that he "did not find any responsive documents," Mot. Ex. 17.   Yet EPA effectively conceded Dickerson *should have* found responsive documents among the Administrator's files when the agency asked this Court for an extension of time to conduct a supplemental search on April 30, 2013. Mot. Extension of Time 2 ("[I]n the process of finalizing the pleadings, EPA determined that another search is required and that there are a number of additional documents that may potentially be responsive to [Landmark]'s request, which have not yet been reviewed by the agency.").   As Wachter revealed in May 2013, EPA's Office of the Executive Secretariat ("OEX"), within the Office of the Administrator, "determined that the search for documents from the former Administrator, the Deputy Administrator, and the

---

[13] Landmark, for its part, did not press Newton for an explanation. *Id.* at 23:3-25:16.

Chief of Staff in the Office of the Administrator may have been insufficient." Of course, the phrase "may have been insufficient" constituted a patent understatement, since EPA's supplemental search produced nearly as many documents as the agency had produced over the three preceding months. Mot. Summ. J., Statement of Material Facts ¶¶ 16-17.[14] Shaw's claims regarding her search of the Deputy Administrator's records, which will be reviewed in greater detail below, are even more dubious.

Nevertheless, Landmark seeks spoliation sanctions, and, with one exception that still does not reach the level of behavior required for *punitive* spoliation sanctions, *see infra* Subsection A.2. (Nena Shaw), there is no clear evidence that spoliation occurred during the delays in searching the records of the Administrator and Deputy Administrator. It is true that Newton failed to notify the Administrator's and Deputy Administrator's special assistants of Landmark's request until after the 2012 federal election. It is true that EPA did not correct Dickerson's defective search of the Administrator's files for more than five months. And it is true that the Deputy Administrator's files effectively went unsearched until six months after Newton's original email notifying other EPA FOIA coordinators of Landmark's request. Yet the Court cannot infer spoliation from delay alone, and Landmark presents no evidence that EPA deliberately or recklessly destroyed, altered, or failed to preserve responsive documents in anticipation of litigation.[15]

---

[14] The Court also finds it necessary to express its confusion regarding Wachter's sworn statement about the need for a supplemental search. Def.'s Mot. Summ. J., Wachter Decl. ¶ 19. Given that Wachter is the supervisor of all FOIA requests within the Office of the Administrator, it is understandable that Wachter would attest to search-related activities. However, in his deposition, Wachter appeared evasive and uninformed about the reasons why it was necessary for EPA to conduct a supplemental search after the April 30, 2012 summary judgment deadline. Mot. Ex. 20 at 68:21-75:8. The Court would have expected the author of a sworn declaration regarding the need for a supplemental search to be more knowledgeable of the events that formed the basis for that declaration.

[15] Nearly two years after completing its initial search, EPA concedes that it never searched the records of the Chief of Staff during that first search. Notice of Withdrawal 2. The Court is at a loss for how it possibly could have taken EPA so long to discover its own failure to search. Predictably, EPA provides no explanation for the impertinent delay in providing this notice. The agency merely states that it "has found no evidence that the EPA's Chief of Staff

2.      *Nena Shaw*

While "[a]gency affidavits enjoy a presumption of good faith," *Ground Saucer Watch,*

*Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981), the declaration signed by Nena Shaw as part of

EPA's opposition to the present motion for spoliation sanctions deserves no such presumption.

Shaw was responsible for searching former Deputy Administrator Perciasepe's records.

According to former Administrator Jackson, Perciasepe was the EPA senior official most likely

to possess documents responsive to Landmark's request. *See* Mot. Ex. 1 at 67:5-11. It is Shaw's

declaration that EPA relies upon to refute Landmark's claim that Perciasepe's files were not

searched until the end of April 2013. Opp'n 30-31. And it is Shaw's declaration that gives this

Court the greatest pause in denying Landmark's motion.

The most favorable interpretation of Shaw's declaration would resemble the following

narrative. Shaw received notice from Newton of Landmark's request on November 14, 2012.

Opp'n, Shaw Decl. ¶ 5. Newton emailed Shaw a second reminder on December 12, 2013. *Id.*

Ex. 3 at 2. One week later, Shaw emailed Newton to ask if he "sa[id] something to [her] about a

'Landmark' FOIA" because she could not locate it. *Id.* In response, Newton re-forwarded his

December 12 and November 14 emails. *Id.* at 1-4. More than one month after Newtown's

original email—a delay caused by her "other duties and responsibilities"—Shaw searched "the

computer and email accounts of the Deputy Administrator." *Id.* ¶¶ 6-8. After discovering some

responsive documents, Shaw attempted to upload these records to the collection database

---

. . . was included in the initial search." *Id.* Of course, such a statement is just another way of admitting that,
between October 2012 and May 2013, the EPA failed to fulfill its unambiguous obligation to search the Chief of
Staff's files, and has waited until February 2015 to admit its error.

However, Landmark does not provide the Court with any evidence that EPA's failure to search the Chief of Staff's
records was due to bad faith conduct. In truth, Landmark does not discuss any issues specifically related to the
Chief of Staff in its briefings on this motion, focusing all of its attention on the Administrator and Deputy
Administrator. *See generally* Mot.; Reply. As such, there can be no punitive spoliation sanctions against EPA on
account of its failure to search the files of the Chief of Staff.

established for Landmark's FOIA request. However, "technical difficulties" prevented the upload from occurring. *Id.* ¶ 10. After receiving a reminder email from Newton on January 17, 2013 "informing [her] that the [EPA] was under a deadline to get the documents produced," Shaw "made another attempt to upload the responsive records into the database on January 30, 2013"—thirteen days later. *Id.* ¶ 11. Once again, Shaw "encountered technical issues and was still unable to upload the responsive documents into the collection database." *Id.* ¶ 12. Instead, Shaw "printed the responsive records," but "do[es] not recall precisely what happened to the printed records." *Id.* Shaw then left her position as special assistant to the Deputy Administrator in April 2013. *Id.* ¶ 13.

At best, Shaw demonstrated utter indifference to EPA's FOIA obligations. At worst, Shaw is lying. There is not enough in the record from either Landmark or EPA to determine which conclusion is correct. What is clear, however, is that Shaw goes out of her way to avoid presenting any defined timeline for her search-related activities, which only adds to the fuzziness of her declaration. It is also evident that, despite two allegedly unsuccessful attempts to upload responsive documents to the Landmark database managed by Newton, Shaw inexplicably never told Newton of her "technical difficulties." In his deposition, Newton stated that, to his knowledge, Shaw never conducted a search of Perciasepe's records.[16] Mot. Ex. 4 at 39:9-11. Thus, at the very least, Newton was wholly unaware of any search performed by Shaw and subsequent "technical difficulties" that prevented any upload of responsive documents to the collection database.

Most strange of all is Shaw's claim that she printed responsive records, but cannot remember what she did with these documents. Such an assertion is about as close to a sworn

---

[16] It also strikes the Court as odd that, after her first unsuccessful attempt to upload responsive documents, Shaw appeared content to simply let these documents vanish into the ether, since she made a second attempt to upload documents only because Newton informed her of an agency deadline. *See* Opp'n, Shaw Decl. ¶ 10-11.

"dog ate my homework" statement as one can make. Nowhere in its opposition brief does EPA claim that the documents purportedly uncovered by Shaw were incorporated into any production made to Landmark. Therefore, the Court can only conclude that such responsive records—if they ever existed in the first instance—have been lost.

If this case were in front of a jury, and Landmark requested an adverse inference instruction as to the Deputy Administrator's responsive documents supposedly uncovered by Shaw, the Court would grant the plaintiff such an instruction. *See, e.g., Mazloum*, 530 F. Supp. 2d at 291 (citing three-factor test required to establish an adverse inference). First, Shaw, an EPA employee charged with coordinating FOIA requests for the Deputy Administrator, had control over the records in question *and* had an obligation to preserve such records at the time she failed to do so. *See* Mot. Ex. 2 at 1-8, 12 (Litigation Hold Notice sent to Shaw on October 23, 2012). Second, Shaw's failure to preserve the responsive documents was surely negligent, and therefore she acted with a culpable state of mind sufficient for issue-related sanctions. *See Residential Funding*, 306 F.3d at 108 (the culpable state of mind factor of the adverse inference instruction test is satisfied by a showing that evidence was destroyed negligently); *see also Mazloum* 530 F. Supp. 2d at 292 ("[N]egligent failure to preserve evidence can support an adverse inference instruction." (internal citation omitted)). Finally, Shaw admits the lost documents were relevant to Landmark's claim. *See* Opp'n, Shaw Decl. ¶¶ 10-12 (found "responsive records" during search of Deputy Administrator's computer and email accounts).

But once again, Shaw's conduct does not quite reach the lofty bar required for *punitive* spoliation sanctions in this Circuit. While there are outstanding questions as to whether Shaw engaged in a good faith search of former Deputy Administrator Perciasepe's records, there is inadequate evidence in the record before the Court regarding whether Nena Shaw—or anyone

else, for that matter—failed to preserve relevant evidence in *bad faith*. Negligence is insufficient to impose punitive sanctions. Instead, Landmark must show by clear and convincing evidence that Shaw acted with a deliberate or, at least, reckless intent not to preserve responsive documents. *E.g.*, *U.S. ex rel Miller*, 2007 WL 781941, at *2. The plaintiff has not done so here.

### 3.    *Personal Email Accounts and BlackBerry Devices*

When addressing the potential use of personal email accounts, the litigation hold notice states that "[f]orwarding emails from your personal email account to your agency account will not relieve you of the responsibility for preserving the emails in your personal account." Mot. Ex. 2 at 7. The hold further commanded EPA employees not to "delete any [potentially relevant information] from your personal email account." *Id.* Given the frequency with which EPA handles FOIA requests, EPA FOIA coordinators and the senior principals they serve should be, at least, generally familiar with the mandates of a litigation hold. Notwithstanding the instructions of EPA litigation hold notices, both former Administrator Jackson and former Deputy Administrator Perciasepe testified that their "practice" was to forward any official communications using their personal email accounts to their EPA email accounts, and that they would delete messages from these accounts. Mot. Ex. 1 at 42:10-18, 62:8-16; Mot. Ex. 21A at 16:15-19, 30:22-32:22, ECF No. 46-22 (Perciasepe Dep., Feb. 21, 2014). When Landmark confronted Jackson with evidence that she did, on at least one occasion, use her personal email account—and BlackBerry—to conduct government business without forwarding the message to her secondary EPA account, Mot. Ex. 24, ECF No. 46-27, Jackson responded that there was no need to do so because the email included "other [EPA] government accounts" as recipients, and thus would be preserved, Mot. Ex. 1 at 52:15-17. Of course, carving exceptions into a standard practice is a slippery slope. And while EPA is correct that Jackson's testimony, in particular,

19

about "delet[ing] many of her personal emails 'en masse' without reading them" is not indicative of any *bad faith* spoliation, Opp'n 14, senior officials should amend such a "practice" of deletion as long as they conduct *any* official business from personal email accounts.

In addition, neither Jackson's nor Perciasepe's personal email accounts or BlackBerry devices were reviewed during EPA's initial or supplemental searches. *See* Mot. Ex. 1 at 42:19-44:18; Mot. Ex. 18 at 38:14-16; Opp'n 5, 10, 18-19 (EPA does not deny Landmark's claim that the agency never searched Jackson's BlackBerry); Opp'n, Shaw Decl. ¶ 9 ("I did not specifically search or request to search [the Deputy Administrator's] text messages, personal email accounts, or other devices or repositories . . . ."). What is more, EPA erased the contents of Jackson's BlackBerry upon her resignation in February 2013, Opp'n 18, despite a litigation hold directive to preserve all ESI regardless of whether it is stored on a BlackBerry, Mot. Ex. 2 at 4.[17] The agency has been unable to "reconstruct" the records housed on the device. Opp'n 18.

Still, Landmark presents no evidence that EPA failed to preserve, intentionally or otherwise, any records associated with Jackson or Perciasepe that were *relevant* to the plaintiff's FOIA search request. The Court cannot simply *presume* bad faith from the facts detailed above. There is no doubt that the approach of EPA's senior leadership to both the *use* and *preservation* of personal email accounts and BlackBerry devices occasionally utilized for agency business was haphazard—indeed, careless to an extent that understandably raises public suspicion. Moreover, the general practice of both the former Administrator and Deputy Administrator to use personal email accounts, even if infrequently, to conduct agency business does not comport with the tenets of EPA's litigation hold notice. But while this Court finds such behavior by EPA's most

---

[17] The litigation hold notice states that, "[u]nless ordered by a Court, EPA does not normally need to preserve disaster recovery backups [or] copies of email on an EPA-issued BlackBerry that automatically synchs with the EPA email system . . . ." Mot. Ex. 2 at 4. However, EPA does not claim that Jackson's personal emails received on her BlackBerry synched with EPA systems. Thus, such a preservation exception would not apply here.

senior leaders to be troubling, it is not behavior that rises to the level of punitive sanctions under existing case law.[18]

However, the Court urges EPA to consider a policy instructing employees who conduct any agency business using personal accounts to (1) forward such emails to their EPA accounts *and* (2) preserve the emails in their personal accounts.   EPA's current Interim Records Management Policy, which postdates Landmark's FOIA request, requires only that EPA staff forward or "cc" electronic files from a personal account to their EPA account.  Opp'n, Hearns Decl. Ex. 2 at 3, ECF No. 55-7.[19]  In fact, the policy encourages EPA staff to *delete* records from non-EPA accounts rather than preserve such ESI.  *Id.* ("Once the electronic files have been captured in an approved EPA records management system, they should be removed from non-EPA information systems, unless there is a specific obligation to maintain the files on all systems

---

[18] Landmark briefly contends that Jackson also used text messages on her Blackberry to communicate with outside entities regarding EPA business.  Mot. 23.  This claim is unsupported by evidence.  Landmark holds up Jackson's statement that she "would be grateful when they did [text her]" as signifying the former Administrator's gratitude for receiving text messages from "people in the environmental movement" with interests before the EPA.  *Id.* (citing Mot. Ex. 2 at 26:6-7).  But it is clear to the Court that Jackson was only referring to receiving text messages from her children when making that statement.  *See* Mot. Ex. 1 at 27:1-8.  This narrow meaning also appeared to be obvious to the questioner—Landmark counsel Arthur Fergenson— who responded to Jackson with, "[a]s we all would," making Landmark's inclusion of this quote in its motion as purported evidence of Jackson's proclivity for texting outside parties regarding official business all the more curious.

[19] The full policy regarding the use of personal accounts to conduct agency business is included here:

> Official Agency business should first and foremost be done on official EPA information systems (i.e., email, instant messaging (IM), computer work stations, shared service solutions, etc.).  When, due to extraordinary circumstances, this does not occur, the creator must ensure that any use of a non-governmental system does not affect the preservation of Federal records for Federal Records Act purposes, or the ability to identify and process those records, if requested, under the Freedom of Information Act (FOIA) or for other official business (e.g., litigation, Congressional oversight requests.).  In this very rare occasion, staff should forward email (or "cc" email) or electronic file(s) to their EPA email account in order for records to be captured in an approved EPA records management system.  Once the electronic files have been captured in an approved EPA records management system, they should be removed from non-EPA information systems, unless there is a specific obligation to maintain the files on all systems on which they appear.  Additionally, emails forwarding a news article or web link from a personal email account into EPA's system and emails forwarding a document to a personal email account to enable printing or viewing both create a copy of the email in EPA's email system.  Users can properly preserve the copy of the email that is on EPA's system to meet their preservation requirements.

*Id.*

on which they appear."). Given the litigious history surrounding EPA, in particular, the agency should understand that *any* act of deleting business records raises unnecessary suspicion of wrongdoing. Furthermore, EPA's litigation hold notice orders EPA staff not to delete potentially relevant information from personal devices or email accounts. Mot. Ex. 2 at 7. The exception to EPA's current policy of deleting already forwarded official records in personal email accounts for "specific obligation[s] to maintain [electronic] files" presumably refers to litigation holds. Opp'n, Hearns Decl. Ex. 2 at 3. Yet, for record-keeping purposes, EPA should not have a policy of preservation *only* in the face of active lawsuits—especially for an agency that so consistently finds itself the subject of litigation. All mainstream email providers—personal or business—provide storage mechanisms that are not time-consuming, such as tagging, foldering, or some other means to quickly warehouse emails. Requiring EPA employees to both forward *and preserve* business-related information received within or sent from personal email accounts would not impose an undue burden on agency staff and, more importantly, would foster greater public confidence in the agency's professed desire for transparency.

### 4.    *Other Forms of Relief*

While the focus of Landmark's motion is punitive spoliation sanctions, the plaintiff also seeks a number of other forms of relief—none of which will be granted here. In its motion for sanctions, Landmark further asks the Court to (1) "[d]esignate an independent monitor" to oversee document preservation and collection related to EPA FOIA lawsuits, (2) "[c]ommand EPA to employ whatever resources are necessary to complete its search and production obligations under [the parties'] new search protocol within 30 days," (3) "[d]irect EPA's Inspector General to investigate and report to Landmark and this Court within 30 days on all spoliation issues . . . covered by Landmark's request," and (4) "[d]irect that EPA review its

docket from 2009 to the present and send a notice to all plaintiffs and petitioners of the findings of this Court and of the real possibility that EPA engaged in spoliation in their proceedings." Mot. 36. And in its reply, Landmark requests, for the first time, that the Court (5) make "a finding on the merits of Landmark's concern . . . that EPA postponed rules and regulations until after the 2012 election in order to advantage the re-election of the President," and (6) order additional spoliation discovery at EPA's expense. Pl.'s Reply 21-22, ECF No. 59.

First, based on the underlying facts of this case, the Court finds it unnecessary to consider appointing any independent monitor to oversee record preservation and collection related to EPA FOIA lawsuits—those brought by Landmark or any other entity. While the Court has made clear its displeasure with EPA's conduct throughout the Landmark FOIA process, appointment of an independent monitor is an extreme and legally uncertain form of sanction that this Court is unwilling to entertain at this time. Second, the parties agreed upon the new search protocol, and Landmark stated at the motion hearing that it has no reason to believe the third search was noncompliant. Thus, there is no need for the Court to issue any "command[s]" regarding the new search. Third, the Court's previous order for discovery on issues related to spoliation provided Landmark with a sufficient opportunity to develop a spoliation claim against EPA. *See Landmark*, 959 F. Supp. 2d at 183-84. Therefore, the plaintiff's additional calls for the Court to (a) "[d]irect EPA's Inspector General to investigate" alleged spoliation in this case and to (b) order additional discovery of "EPA spoliation policy" at the agency's expense are gratuitous. Fourth, it is not the Court's place to order the EPA to provide notice of anything related to this case "to all plaintiffs and petitioners" since 2009. Any former plaintiffs in actions against the EPA are free to follow this matter on their own accord. Finally, the Court can make no findings "on the merits of Landmark's concern . . . that EPA postponed rules and regulations until after

the 2012 election." As Landmark conceded during the motion hearing, the plaintiff has failed to uncover any evidence in support of such a judgment. *Supra* n.12. Given EPA's suspicious conduct in the months following Landmark's FOIA submission, the plaintiff's request for a ruling on the merits, at least based upon circumstantial evidence, is not altogether unreasonable. Nevertheless, the Court finds, under the existing record of circumstantial evidence, that EPA's behavior is more consistent with ineptitude than bad faith.[20]

## IV.   CONCLUSION

Despite prior admonitions from this Court and others, *e.g.*, *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70 (D.D.C. 2003); *Landmark*, 959 F. Supp. 2d 175, EPA continues to demonstrate a lack of respect for the FOIA process. The Court is satisfied that EPA voluntarily conducted a supplemental search upon discovering that its initial search was deficient. Yet such a supplemental search would have been unnecessary if EPA took its FOIA obligations seriously in the first instance. Despite all of the obvious errors made by EPA in its original search, which spanned the course of seven months, neither EPA nor its counsel has offered Landmark or this Court any indication of regret. The closest EPA has come to admitting the shoddy nature of its initial search is when its counsel conceded at the motion hearing, in the context of potentially owing attorney fees to the plaintiff, that Landmark has "prevailed."[21]   *See* 5 U.S.C. § 552(a)(4)(E). The Court is left wondering whether EPA has learned from its mistakes, or if it will merely continue to address FOIA requests in the clumsy manner that has seemingly become its custom. Given the offensively unapologetic nature of EPA's recent withdrawal notice, ECF

---

[20] At the motion hearing, Landmark raised the specter of criminal contempt sanctions for the first time. Pursuant to the Court's analysis set out above, there are insufficient grounds upon which to grant criminal contempt sanctions against EPA. Accordingly, EPA's recently filed motion for leave to file a supplemental memorandum in opposition to Landmark's oral motion for criminal contempt sanctions [67] is DENIED as moot.

[21] Government counsel did not concede entitlement or any other issues related to the reasonableness of possible fees.

No. 66, the Court is not optimistic that the agency has learned anything.

At bottom, EPA's mishandling of Landmark's request leaves far too much room for a reasonable observer to suspect misconduct. However, general negligence or indifference in handling a request, without at least clear and convincing evidence of bad faith failure to preserve responsive documents, is insufficient for a finding of punitive spoliation sanctions. Yet while it falls outside this Court's inherent power to order the sanctions that Landmark seeks, the recurrent instances of disregard that EPA employees display for FOIA obligations should not be tolerated by the agency at large. FOIA is wholly dependent upon an environment of trust. But it is plain to this Court that EPA perceives Landmark as an enemy, rather than "a rightful participant in a FOIA regime . . . ." Mot. 31. This Court would implore the Executive Branch to take greater responsibility in ensuring that all EPA FOIA requests—regardless of the political affiliation of the requester—are treated with equal respect and conscientiousness.

For the foregoing reasons, the Court DENIES the plaintiff's motion for spoliation sanctions [46]. Any request by the plaintiff for attorney fees and costs pursuant to FOIA shall be set forth in a separate motion.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on March 2, 2015.